## Spring vs. Russell & als.

Fresh water rivers, of public use in the transportation of goods, are of common right as public highways by water.

Whether a person whose private property has not been taken from him, and whose rights are only consequentially affected, by a statute creating a corporation for opening a canal, has a right to contest its constitutionality :—*dubitatur.*

The legislature has the power to judge when the public exigency requires that private property be taken for public uses. And it is within the range of its powers to change the course of a public river, for the public convenience.

Where a private statute created a corporation for the purpose of opening a canal, without directing when it should be done; under which statute the defendants, as corporators, justified certain acts complained of; and the plaintiff replied that they had never opened the canal in manner and form as prescribed by the statute, without alleging that reasonable time for that purpose had elapsed; the replication was for this cause held bad on general demurrer.

The statute incorporating the proprietors of the *Fryeburg* canal having prescribed a particular remedy for all damages occasioned by opening the canal, all other modes of remedy are by necessary implication excluded.

The proprietors of the *Fryeburg* canal are not liable to an action for consequential damages occasioned by turning the channel of *Saco* river as directed by their act of incorporation.

THIS was an action of trespass on the case, in which the plaintiff declared as follows :—"for that a certain river called *Saco* river, had for a long time before the opening and removing of the banks thereof, herein after mentioned, to wit, from the time whereof the memory of man is not to the contrary, to the time last aforesaid, flowed in a certain channel or course, from the line of the State of New Hampshire, through the said town of *Fryeburg* to the sea; and the inhabitants of the said State of Maine and others had been accus-

35

tomed during the time aforesaid to have their logs and timber float along and down the same river, below said town of *Fryeburg*, to be used below the town last mentioned ; and the said *Spring* avers, that the said defendants afterwards, to wit, on the first day of *July*, in the year of our Lord eighteen hundred and fifteen, well knowing the premises, removed and opened, and caused to be re-moved and opened the banks of said river, and thereby diverted and turned a great portion of the water of said river from its natural and usual channel and course ; and until the commencement of this ac-tion, the water of the same river, by means of the same opening of said banks, was so diverted and turned from its accustomed channel, and the defendants thereby obstructed and prevented the floating and passing of logs and timber along the usual channel of said river as before the opening of the banks aforesaid ; and the said *Spring* further avers, that after the opening and removal of said banks of said river as aforesaid, and before the commencement of this suit, that he the said *Spring*, put and had a great number of logs, to wit ten thousand logs, of great value, to wit of the value of ten thousand dollars, in the said river, above the place where the banks thereof were opened as aforesaid, for the purpose of having the same logs floated down the same river to be used below the opening of the said banks, which said logs, by means of the opening and removal of said banks of said river as aforesaid were prevented from floating down the same river, as they otherwise would have done, and there-by were carried from the natural channel of said river, and became of no value, and were wholly lost to said *Spring*."

The defendants severally pleaded—*first*, the general issue ; which was joined.

*Secondly.* That they were not guilty within six years before the commencement of the action ; on which issue was taken to the country.

*Thirdly.* That by a private statute passed *March* 2, 1815, which they set forth, certain persons, including the defendants, were incor-porated by the name of the Proprietors of *Fryeburg* canal, for the purpose of opening a new channel for *Saco* river within the town of *Fryeburg*, by turning its waters through *Bear* and *Bog* ponds ; in

which act it was provided that the proprietors should be liable in their individual as well as corporate capacity, together with their real estate, for the damages thereby occasioned ; and that if any person should be damaged in his property by reason of opening or manag-ing such new channel, without satisfaction made by the proprietors within thirty days after demand, he might have remedy by complaint made within two years thereafter to the Court of Common Pleas or to the Supreme Judicial Court, who should determine the same by a jury, unless the parties should substitute a committee for the same purpose; upon whose report, or the verdict of the jury, the Court should render a final judgment; saving to the proprietors the right to tender amends for the damages so occasioned :—

And that by another private statute, which they set forth, passed June 20, 1816, it was provided that any person who should be dam-aged in his property by the opening of such new channel, and who should claim damages of the corporation, should deliver his claim in writing to the clerk of the proprietors, after which the corporation should be allowed ninety days to settle the claim, before any com-plaint should be made to either of the courts for damages : Also, that the corporators might erect mills on the new channel : And that all claims or right of action which individuals might have against the corporation or the members thereof, by reason of opening such new channel, should be barred and cease at the expiration of four years from and after the time when the cause of action accrued :—

And that by another private statute, which they set forth, passed Feb. 23, 1818, it was provided that the real estate of the original corporators should be liable for the damages occasioned by opening the new channel, only so long as they continued the owners thereof ; and limiting the remedies for such damages to " six years from and after the time the said Saco river shall have been turned and taken its course through the said new channel :"—And thereupon they averred that the said persons thereby became a corporation accor-dingly ; and at a legal meeting of the corporation holden Sept. 29, 1817, and adjourned to Oct. 13, 1817, they accepted said acts, and were duly organized as a corporation ; on which last mentioned day they voted to open the new channel, of which the plaintiff had no-

tice;—and that the supposed wrongs mentioned in the plaintiff's declaration were done by the defendants as members of the corporation, and by its license, direction and permission, by virtue of the statutes aforesaid;—and that the supposed cause of the plaintiff's action did not accrue at any time within four years next before the commencement thereof:—

*Fourthly.* After stating the acceptance of the acts, the incorporation of the proprietors, the vote to open the new channel, and the acts done in pursuance thereof, as before; the defendants pleaded that more than six years next before the commencement of the plaintiff's action, viz. on the last day of *February* 1822, the *Saco* river was turned and had taken its course through the new channel; and that the plaintiff never, at any time within six years thereafter, preferred any claim for damages occasioned thereby, in any mode mentioned in said statutes:—

*Fifthly.* After stating as in the inducement to the fourth plea, the defendants pleaded that more than six years next before the commencement of this action, the *Saco* river was turned and had taken its course through the said new channel, to wit, &c.

*Sixthly.* After stating as before—the defendants pleaded that the plaintiff never did exhibit and deliver his claim in writing to the clerk of the proprietors, and therein name the sum claimed by him as damages, as provided in said statutes:—

*Seventhly.* After stating as before—the defendants pleaded that the acts complained of were done by them as members of the corporation, and in pursuance of said statutes; and that the plaintiff never applied to either of the courts for the appointment of a committee to estimate his damages, pursuant to the statute passed *June* 20, 1816.

To each of these pleas the plaintiff replied that the corporation had never opened a new channel for *Saco* river, in the manner provided in the acts before recited.

The defendants, in their rejoinder to the *third* replication, insisted on the limitation of four years, pleaded in their third plea; traversing the matter of the replication.

To the *fourth* replication they rejoined that more than six years

before the commencement of the action, the *Saco* river was turned and had taken its course through said new channel.

To the *fifth* replication they rejoined as in the fourth rejoinder, with a traverse of the plaintiff's allegation that the proprietors had not opened the new channel.

The *sixth* rejoinder was similar to the fourth.

And to the *seventh* replication the defendants answered by a general demurrer; which was joined.

The parties then agreed on a commissioner, to repair to *Fryeburg*, and hear the testimony, and make a report to the court of all material facts proved before him; and that upon said facts, and upon the several pleadings which had terminated in demurrers, the court should decide whether, upon legal principles, the action could be maintained; and if so, to render judgment conformably to law.

The following are the material parts of the commissioner's report:

"Previous to the year 1819 or 1820, the *Saco* river flowed in a certain channel from the line of the State of New Hampshire, through the town of *Fryeburg*; and the inhabitants of the State of Maine, as well as others, had been accustomed to float their logs and timber down and along said river, in its ancient channel, through and below said *Fryeburg*. Since the year 1820 all the water of said river has been diverted from its ancient channel and course, through a part of said *Fryeburg*, and flowed in a new course and direction, leaving its ancient channel at *Russell's creek*, so called, in said town, and flowing through *Bear* and *Bog* ponds, meeting its former channel again near the land of *John H. Frye*; and running in this new course through what is called the canal. The course of the river has been changed as aforesaid, and a new direction given to it, by the labor of individuals at different times, in opening and removing its banks and digging up the earth and making a channel where it now flows. Previous to the diversion of the waters of the river as aforesaid, it had been deemed of great importance by a portion of the inhabitants of the town, to produce that result, for the advancement of their agricultural interest, and enhancing the value of their land situated upon and near the river; and with this view,

thirty years ago, the undertaking had been commenced of opening a communication through the high land which separated *Bear* and *Bog* ponds. In very high freshets the water of *Saco* river would flow over its banks into *Bear* pond ; and in the great freshet of 1785, it flowed over and tore out a "Gulf" so called, from the height of land between *Bear* and *Bog* ponds. In 1814 the freshet of that year made the channel into *Bog* pond wider and deeper, which was enlarged, by the freshets of 1819 and 1820, into the deep and broad channel through which the river now flows. In its present course, the river runs a less distance in *Fryeburg* than formerly, by fifteen or eighteen miles. The fall round the old river to the mouth of the canal, except rapids, is estimated at one foot a mile."

" It was proved that the corporation was duly organized ; and that at the original and subsequent meetings the following votes among others, were passed."

" *October* 13, 1817—*Voted*, to take up the third article of the warrant, which was as follows, viz. to see if the proprietors would proceed to act on the grant of the Honorable General Court incorporating the proprietors of said canal, as said grant now stands amended ;—and *Voted*, to proceed on the grant of the Honorable General Court and to open said canal."

*Voted*, to choose a committee of five persons to superintend the business of opening said canal."

" *October* 22, 1817—*Voted*, to see if said proprietors will instruct their committee to open said canal. Voted by yeas and nays so to instruct their committee ; all the votes being in the affirmative but one."

*October* 30—*Voted*, to direct the committee to proceed on monday next to work on said canal."

*December* 27, 1817—*Voted*, to raise five hundred dollars to meet the expenditures that have already accrued in opening the canal, the remainder of the money, if any, to be paid in labor by the delinquent proprietors if wanted, provided they come in and do the labor, when called upon by the committee."

" *September* 8, 1818—*Voted*, to direct the committee to proceed

in opening the canal;—and *Voted*, to raise two hundred dollars for the purpose of opening said canal."

"*March* 22, 1822. The third article in the warrant was to choose a committee to open the channel from *Bog* pond to *Saco* river, the summer ensuing. Under this article it was *Voted*, to empower the standing committee to take such measures to open the channel from *Bog* pond to *Saco* river as they should think proper."

"*October* 7, 1822. *Voted*, to choose a committee of three persons to superintend the further opening of said canal."

"*Article* 7. To raise money to meet the expenses that have already accrued in opening said canal, and to pay such damages as the proprietors may think proper to individuals who claim the same, and for the further exigencies of said proprietors. *Voted*, to raise three thousand dollars for the purposes expressed in the seventh article."

"It was further proved, that in the ordinary course of events, logs and timber might be floated down the former channel of the river, by the use of competent skill and proper care, without difficulty, and with little or no loss. In great freshets however, when the river was unusually high and its banks were overflowed, very considerable losses had been sustained by the logs floating upon the intervales and into the creeks, gulfs and ponds adjacent to and connected with the river. Great losses were sustained by the log owners in 1785, 1807 and 1814, by the extraordinary freshets of those years; and in all human probability consequences equally disastrous would have happened from the freshets of 1819, 1820, 1826, and 1827, had *Saco* river continued to flow in its former channel."

"Since the diversion of the water of the river from its former channel, it has been found more difficult and expensive, and less safe and convenient, in many places on the river above and below the canal, to drive and float logs down and along the same. The channel of the river above the canal, has been deepened from *Swan's* falls, so called; the water is drawn off with more rapidity than formerly, and extensive flats have been created. The distance from the commencement of the canal to the head of the flats, is one hundred and ninety rods, and the distance across them in the widest

place, is ninety six rods, including ten rods for the width of the river. Below the canal the river rises higher and quicker and falls sooner than heretofore, and logs are now more liable to be thrown far upon the intervales and scattered and detained or lost; and a shorter time is afforded for the convenient running or floating of logs, when the water is at a suitable pitch for that purpose, than formerly."

" The distance from the old river at the head of the canal, to the bridge at the lower end of *Bear* pond, is two hundred and ninety four rods; and the distance thence to *Bog* pond is one hundred and twenty rods."

" The canal here for the most part is very broad, with large sand flats; and requires a high pitch of water in the river above, in order to float logs through it. That height of water which was safest and best to drive logs round the old river formerly, would now be insufficient to float them in this channel to *Bog* pond."

" Adjoining *Bog* pond is an extensive tract of low meadow land or bog, which is always flowed when there is sufficient water in *Saco* river to float logs into that pond. Upon this bog, when thus flowed, logs and timber are more or less driven and scattered by the wind and currents among trees and stumps; rendering it difficult and expensive for the owners to remove them, and sometimes impracticable, when the water subsides, until another freshet succeeds. By these means logs are often detained a long time from their places of destination; and when received, are diminished in value by exposure to the elements and other causes."

" Previous to the year 1824, there was no proper channel or canal from *Bog* pond, through which the logs which had been driven into that pond or upon the bog, might be floated to the old river below. *Thomas Day* and *David Bradley*, two of the defendants, with *Robert Bradley*, Esq. first explored the passage for a channel from said pond to the river in 1821, and worked in digging and opening the present channel in 1822. After they had commenced and made considerable progress in the work, they were aided in it by others, proprietors of the *Fryeburg* canal. The first year after it was commenced, a channel was dug four feet deep and sixty or eighty rods in length. The undertaking was afterwards continued

and so far completed as to admit the passage of logs through this channel in 1824."

" Since the year 1824, by the flowing of the water through the new channel, it has been greatly increased in width and depth. The channel in the narrowest places was proved to be at this time about thirty three feet wide, and in the widest upwards of a hundred feet, and the banks at low water about five feet above the water, which was from six to eight feet deep, except at the outlet of the pond, where the water is shoal. This channel is crooked and somewhat circuitous. Since the year 1824, the owners of logs have found less difficulty and incurred less risk and expense in driving their logs through the canal, than in the preceding years. The opening of the channel from *Bog* pond to *Saco* river was a benefit and not an injury to the log owners."

" From the year 1820 to 1826, there were no freshets of extraordinary magnitude, and during that period probably logs might have been floated round the *Saco* river had it run in its ancient channel, with but little risk, expense or loss to the owners."

" It was also further proved, that the plaintiff, *John Spring*, was the owner of a large number of logs, which at different times had been put into *Saco* river above the head of the canal, for the purpose of being floated down the river to be used and disposed of below the town of *Fryeburg*, from the year 1821 to the time of the commencement of this suit; which logs, by the opening of the canal, and diverting the water of the river as aforesaid, were prevented from floating down the river as they otherwise would have done, and were floated into the canal, out of the usual and natural course of the river; that said *Spring* has within six years suffered loss and sustained damages by reason of his logs running into the canal, and being prevented from following the ancient and natural channel of the river, to the amount of thirteen hundred dollars."

*J. & E. Shepley*, for the plaintiff. The injuries sustained by the plaintiff being found to have been done within six years, the action is not barred by the general statute of limitations. In an action of the case for consequential damages, like the present, it is not the first act in a series of events resulting in an injury, which gives the

right to sue; but it is the injury itself which is the ground of the ac
tion. The first act is regarded merely to ascertain if the injury is
one which the law will repair. However long the mischief may
have been continued, the right of action attaches only when the party
begins to be damnified. Such is the principle recognized in fixing
the time of commencing the period of limitation of suits against the
administrator of an insolvent estate. *Walker v. Bradley*, 3 *Pick.*
261; *Sherman v. Atkins*, 4 *Pick.* 283; *Chandler v. Chandler, ib.*
78. So in actions of the case. *Beasley v. Shaw*, 6 *East*, 208;
*Weld v. Hornby*, 7 *East*, 196; *Sherwood v. Burr*, 4 *Day*, 244;
*Rice v. Hosmer*, 12 *Mass.* 127; *Mather v. Green*, 17 *Mass.* 60;
*Cro. El.* 402; *Cro. Jac.* 231; 1 *Com. Dig. Action on the case
for Nuisance B.*

Neither is the plaintiff's right to recover barred by the acts in-
corporating the proprietors of *Fryeburg* canal, or further modifying
their powers.

Because—1st. Those acts are unconstitutional. By the con-
stitutions of this State, and of the United States, no man's property
can be taken from him under the public authority, except for public
uses. The private property of one man cannot, in any case, be
taken for the private use of another. *Ken. Prop'rs. v. Laboree*, 2
*Greenl.* 290. Now here, the plaintiff, as well as others, had a ves-
ted right to the navigation of *Saco* river, by the usage of more than
twenty years; *Berry v. Carle*, 3 *Greenl.* 269; and this right none
but the legislature, and for public uses, could take away. But the
acts in question appear to have been passed for the benefit of pri-
vate individuals; who are made liable in their estates for all dama-
ges; and without any remuneration in tolls, the benefit being deriv-
ed from the increased value of their estates. Restrictions and in-
cumbrances like these, not being usually imposed in cases of
public interest, show that this was deemed by the legislature to
be merely a private speculation. Besides, the alteration is found
by the commissioner's report, to be detrimental to the navigation of
the river; and useful to no one, except to the lands of the corpora-
tors. And to justify such an invasion of private rights it should ap-
pear, on the face of the statutes, that the design was for the public

good. But whether the whole grant is unconstitutional or not, yet the limitation in these statutes is inoperative and void, because it goes to establish a rule in favor of one class of citizens which is not granted to all; exempting these corporators from the operation of the general statute of limitations. *Holden v. James*, 11 *Mass.* 405; *Piquet, appt. &c.* 5 *Pick.* 65; *Lewis v. Webb*, 3 *Greenl.* 336.

2. The remedy given by these statutes is cumulative only; and does not take away the right to sue at common law. To this point the rule is that no statute is to be construed as taking away a common law right, unless the intention is manifest. *Melody v. Reab*, 4 *Mass.* 373. But here, the remedy by complaint lies only against the corporation; and as the individuals are also made liable, the remedy against them is left at common law. The court seem to have taken this view in *Prop'rs. of Fryeburg Canal v. Frye*, 5 *Greenl.* 43. The cases of *Stowell v. Flagg*, 11 *Mass.* 364, and *Stevens v. The Middlesex Canal*, 12 *Mass.* 466, are not opposed to this position; the general mill-act being manifestly for the public benefit; and the act in the latter case containing no provision for individual liability.

3. Nor do these acts contemplate any injuries to be redressed by the particular method therein prescribed, except injuries to real estate. The word "property" has generally been interpreted in this sense, in other statutes of a similar character. *Boston & Roxbury mill corp. v. Gardiner*, 2 *Pick.* 37. And it may be so inferred from the limitation here commencing at the time the channel is changed; by which act the land alone can receive damage. So the mills, which the corporators are authorized to build, may be erected at any time, after this particular limitation is expired; and upon any other than the construction contended for, the party injured would be without remedy.

4. Neither do these acts purport to afford protection to the corporators for injuries sustained by others on other parts of the river, beyond the limits of the canal. Yet the case finds that the river has been deepened in one place; its force altered for the worse in others, and that flats of ninety rods in breadth have been created above

the mouth of the canal; which is not the necessary consequence of making it, but on the contrary is an abuse of the powers granted.

5. And the defendants themselves are not protected by the statutes, because they have not opened a new channel in the manner intended by the legislature. If the statutes intended a public benefit, on which ground alone can their constitutionality be defended, it was by opening a safe, practicable and convenient passage for the floating down of timber as before. It was never designed to destroy the navigable character of the river, and do an irreparable injury to those who had been accustomed to use its waters ; but only to change its course. Unless, therefore, the corporation has opened such a passage, the acts afford them no justification, sufficient time to do this having long since elapsed. This corporation, also, is specially vested with all the powers and privileges of corporations of the like nature. It must therefore be subject to similar obligations and duties. Now all other similar acts of incorporation, in Massachusetts, are manifestly designed to improve the navigation of the waters. There is no ground, either on the face of the statutes, or in their subject matter, for any other conclusion. Yet these individuals, so far from improving the navigation, have essentially injured, and nearly destroyed it ; wasting its waters over so wide a surface as to create shoals and morasses in which the property of the citizens is detained and lost. *Wales v. Stetson*, 2 *Mass.* 146 ; *Coolidge v. Williams*, 4 *Mass.* 40 ; *Hood v. Dighton bridge*, 3 *Mass.* 267.

The *seventh* set of pleadings, terminating in demurrers, present the question whether the defendants are justified by the statutes, after having admitted that their requirements have in no respect been complied with. To allow such a justification would be to legalize any mischief which corporators could be found willing to perpetrate. *Andover & Medford Turnpike Corp. v. Gould*, 6 *Mass.* 40 ; *Commonwealth v. Heare*, 2 *Mass.* 102 ; *Stanwood v. Pierce*, 7 *Mass.* 458 ; *Steele v. Western Inland Lock Navigation comp.* 2 *Johns.* 283.

*N. Emery* and *Fessenden* argued for the defendants :—1st. That under the general issue the defendants could not be found guilty, the case finding no facts on which they could properly be charged.

2. That the general statute of limitations began to run from the time of the first act openly done, which was more than six years before the commencement of the action. *Hurst v. Parker*, 1 *Barnw. & Ald.* 92; *Dyster v. Battye*, 3 *Barnw. & Ald.* 448; *McFadson v. Oliphant*, 6 *East*, 387; *Coke v. Sayer*, 2 *Wils.* 85; *Reed v. Markle*, 3 *Johns.* 523; *Bank of Utica v. Childs*, 6 *Cowen* 238; 2 *Salk.* 442; 1 *Ld. Raym.* 772.

3. That the particular limitations in these statutes commenced at the time the current of the river was in fact turned, by whatever agency this may have been done. *Fisher v. Hamden*, 1 *Paine's Rep.* 55; *Boyden v. Drummond*, 2 *Campb.* 157; *Bishop v. Little*, 3 *Greenl.* 405; 9 *Dane's Abr.* 491; 5 *Barnw. & Cresw.* 149, 259; *Troup v. Smith's Ex'rs.* 20 *Johns.* 33; *Iveson v. Moor*, 1 *Comyn*, 58; 6 *Cowen* 189; *Mullaghan v. Palmer*, 3 *Caines*, 307.

4. That *Saco* river was a public highway, in the use of which no person had such a vested right as to deprive the legislature of the power to alter its course, for the public good; and at its discretion to limit the mode of remedy for damages occasioned to the property of individuals.

5. That the mode of redress provided in these statutes was not cumulative. They are public acts, to be construed as other statutes relative to highways, the provisions of which are held to take away all remedies at common law. *Gedney v. Tewksbury*, 3 *Mass.* 307; *Smith v. Drew*, 5 *Mass.* 514; *Commonwealth v. The Bluehill turnp. corp.* 5 *Mass.* 520; *Commonwealth v. Coombs*, 2 *Mass.* 489; *Arundel v. McCulloch*, 10 *Mass.* 70; *Craigie v. Mellen*, 6 *Mass.* 7; *Wales v. Stetson*, 2 *Mass.* 143; *Hood v. Dighton*, 3 *Mass.* 263; *The Governor and Comp. of the cast plate manuf. Co. v. Meredith*, 4 *D. & E.* 794; *Stowell v. Flagg*, 11 *Mass.* 364; *Cro. Jac.* 644; *Williams v. Hingham and Quincy turnp.* 4 *Pick.* 341.

6. That a demand in writing by the plaintiff, according to these statutes, is a condition precedent, without which he cannot recover.

7. That the transactions complained of were lawful acts, relating to public property, and therefore formed no foundation for a claim

of consequential damages. *Callender v. Marsh*, 1 *Pick.* 418; *Stat.* 1821, *ch.* 118, *sec.* 1; 1 *Chitty's Pl.* 133.

8. That the plaintiff having purchased his timber several years after the river was turned, he took it subject to all the inconveniencies resulting from the existing state of the river, and therefore at a price proportionably reduced; which being the loss of the seller and not his own, he has no claim for damages.

9. That if he had a remedy, it was local, and should be sought in the county of *Oxford*; being in the nature of case for a nuisance. *Warren v. Webb*, 1 *Taunt.* 379.

*E. Shepley*, in reply, to the point that fresh rivers partook of the nature of highways only so far as the right of passage was concerned; and that the legislature could change their channels only for public and not for private purposes; cited *Hargrave's law tracts*, 5, 8, 9; *The people v. Platt*, 17 *Johns.* 195; *Hooker v. Cummings*, 20 *Johns.* 90; *Angell on Water courses*, *p.* 14. And he urged that the limitation was unconstitutional, being from a fixed day, and not from the time of the act done. 1 *Ld. Raym.* 307, 1 *Chitty*, 233.

This cause was argued at the last *April* term; and the opinion of the Court was now delivered by

MELLEN C. J. It appears by the report of the commissioner who was appointed, by consent of parties, to ascertain and settle the facts in this case, that the plaintiff has sustained damages within six years next before the commencement of the action, to the amount of thirteen hundred dollars; by reason that his " logs, by the opening of said canal and diverting the water of said river as aforesaid, were prevented from floating down said river as they otherwise would have done, and were floated into said canal, out of the usual and natural course of said river; and by reason of said logs running into said canal, and being prevented from following the ancient and natural channel of said river;" and the question before us is, whether he has a right to recover all or any part of that sum, upon a view of all the facts detailed in the report, and the application of

legal principles to those facts. We have listened with patience, pleasure and profit to the learned and elaborate arguments of the counsel upon the numerous questions discussed, arising on the several issues joined; and, aware of the interesting nature of the cause to the parties, in a pecuniary point of view, as well as of the importance of some of the principles involved in its decision, we have examined it with attention, and have formed an opinion which we believe to be correct.

The act incorporating the proprietors of the *Fryeburg* canal was passed on the second day of *March*, 1815, and they are vested thereby " with all the powers and privileges which are by law incident to corporations of the like nature for the purpose of opening a new channel for *Saco* river within the town of *Fryeburg*" from one point on the river to another, particularly described in the act. The second section declares that the persons named in the first section " shall be liable in their individual as well as in their corporate capacity to make good all damages sustained by any person or persons, in consequence of opening said new channel;" and it creates a lien upon the real estate of the several corporators. The third section declares " that in all cases where any person shall be damaged in his property, by reason of opening or managing said new channel or canal, and the said proprietors do not within thirty days after being requested thereto in writing, make or tender reasonable satisfaction to the acceptance of the person so damaged, such person damaged as aforesaid, may apply in writing to the Court of Common Pleas or the Supreme Judicial Court holden within the county where the damage is sustained, within two years thereafter for redress." The section then goes on and prescribes the particulars of such proceeding by complaint. An additional act, passed on the 20th of *June*, 1816, prescribes some further restrictions as to the mode of prosecution by complaint; authorizes the proprietors to purchase and hold real estate on the river and canal to a certain amount; and declares that all claims or right of action, against the corporation or the members thereof, shall be barred at the expiration of four years from the time the cause of action shall have accrued. The act of *February* 23, 1818, bars all such claims or

right of action at " the expiration of six years from and after the time the said *Saco* river shall have been turned, and taken its course through the said new channel." The act of *June* 19, 1819, merely relates to the choice of assessors and the assessment and collection of sums assessed, and has no relation to this cause. Neither of the acts before mentioned limits the time within which the canal was to be opened and the river to be turned into and take its course through it ; nor does either of them authorize the proprietors to demand or receive any toll from those whose property should be transported upon its waters.

The defendants have severally pleaded seven pleas, viz :—the general issue and six special pleas in bar. Four of the six are pleas founded on the general statute of limitations, or the special limitations in some of the acts before mentioned ; the sixth is a plea of conformity to the act of incorporation in opening the canal. The seventh plea states in substance, the organization of the proprietors under the act of incorporation and some of their proceedings preparatory to their commencing the work intended ; and each defendant in this plea says that the acts done and complained of in the writ, were done by him, as one of the corporation, and under its authority, in opening the canal. The plaintiff to this replies and says that the proprietors did not open the canal in conformity to the act. To this there is a general demurrer. At present we shall confine ourselves, to the examination of the cause as presented on this issue ; waiving the numerous questions arising upon the six other issues. We adopt this method, because the seventh plea discloses the character in which the defendants acted, and opens the whole subject to consideration, as well as the legal objection to the sufficiency of the replication to this plea ; though there is no doubt we are at liberty to examine all the merits of the cause, so far as facts are concerned, upon the general issue ; for in the agreement of the parties as to the appointment and powers of the commissioner, it is expressly stated, that the court, upon the facts reported by him, and upon the several pleadings which have terminated in demurrers, shall decide the cause.

Prior to the act of incorporation in 1815, *Saco* river passed

through the town of *Fryeburg* in a very circuitous manner. By the opening of the canal, its winding course has been essentially altered, and it has been shortened fifteen or eighteen miles in that town. It is stated or admitted that until it was so shortened by means of the canal, " the inhabitants of the State of Maine, as well as others, had been accustomed to float their logs and timber down and along said river, in its ancient channel, through and below said *Fryeburg*." The allegations in the writ are, that the defendants on the first of *July* 1815 " removed and opened the banks of said river, and thereby diverted and turned a great portion of the water of said river from its natural and usual channel and course, and until the commencement of this action the water of the same river, by means of the same opening of said banks, was so diverted and turned from its accustomed channel, and the defendants thereby obstructed and prevented the floating and passing of logs and lumber along the usual channel of said river, as before the opening of the bank." The plaintiff then avers that his logs which he had in *Saco* river above the opening in the bank, " by means of the opening and removal of said bank of said river as aforesaid, were prevented from floating down the same river, as they otherwise would have done, and thereby were carried from the natural channel of said river, and became of no value, and were wholly lost to said *Spring*."

Whatever acts the defendants did, of which the plaintiff complains, they claim to justify under the act of incorporation. This act and those additional thereto, the plaintiff's declaration and the pleadings, together with the report, present three general questions to view :

1. Whether the plaintiff has suffered any damages for which he ever could maintain any legal process.

2. If so, does a common law action furnish a legal remedy for their recovery ?

3. Has the remedy been lost by the operation of any of the statute limitations on which the defendants rely in their pleas.

*Damnum absque injuria*, is not a legal novelty. It does not necessarily follow that because a plaintiff may have sustained a serious injury in his property, consequent upon the voluntary acts of a defendant, that therefore he has a right to recover damages for that in-

37

jury. Some acts may be justified by an express provision of law, or the damage may have arisen as the consequence of those acts which others might lawfully do in the enjoyment and exercise of their own rights and management of their own business; or it may have resulted from the application of those principles by which the general good is to be consulted and promoted, though in many respects operating unfavorably to the interests of individuals in society. Other instances might be stated. Such is and must be the law of society. But we proceed to the consideration of the first question.

Fresh water rivers, though in point of property, they are *prima facie* private, yet they may be of public interest, and belong to the people at large as public highways. Rivers of public use in the transportation of property are of this class; and being subservient to commerce, have by general consent of mankind and by the rule and authorities of the common law been considered as things of common right. Sir *Matthew Hale*, in his learned treatise *de jure maris*, lays down the doctrine that fresh rivers belong to the owners of the adjacent soil; but that such rivers as well as those which ebb and flow, may be under servitude of the public interest; that is, may be of public use for the carriage of boats, &c. and in this sense may be considered as public highways by water. *Harg. Tracts, ch.* 3, 8; *Davies Rep.* 152; 4 *Burr.* 2162; *Palmer & al. v. Mulligan & al.* 3 *Caines* 307; 3 *Kent's Com.* 344; *Berry v. Carle & al.* 3 *Greenl.* 269.

*Saco* river in the town of *Fryeburg* is one of the character above described; not a navigable river, however deep and large, in common law language, being above tide waters; but one under servitude to the public interest, and over the waters of which the *public have* a right to pass. In this respect such a river resembles a highway on land; for the land over which a highway is laid out is private property; yet the highway belongs to the public for the common use. The owner of land adjoining a fresh water river owns to the thread of the river; so if a man purchase land bounded on one side by a highway, the deed will convey to him the land as far as the centre of the road. 3 *Kent's Com.* 349, and cases there cited. The legislature, if they see cause, may lay out a highway; and for reasons

satisfactory to them, they can discontinue or change the course of it. It is equally true, and is admitted by the counsel for the plaintiff, that the legislature may alter the direction of a river when the public good requires it; and that if the act incorporating the proprietors of the canal in question was passed for public benefit and not for private accommodation and advantage, the act is so far constitutional. But he contends that individual interests and personal or private considerations were the only objects in the view of the legislature.

It is said that this fact appears from the report; it only appears that thirty years ago " it had been deemed of great importance by a portion of the inhabitants of the town to produce that result" (the diversion of the waters of said river as aforesaid) " for the advancement of their agricultural interest and enhancing the value of their land situated upon and near the river; and the undertaking had been commenced of opening a communication through the high land which separated *Bear* and *Bog* ponds." The opinions and proceedings above mentioned do not appear to have any connexion with the act in question or with the persons therein named. Besides, as we determined in the case of *Thomas v. Mahan & al.* 4 *Greenl.* 513, we are not at liberty to travel out of the act in search of its meaning; but must give it such a construction as its language authorizes and seems to require; remembering at the same time that when the constitutionality of the law is in question, we should be on our guard not to decide and pronounce it to be unconstitutional, by ascribing motives for its enactment which perhaps never existed, and excluding from our view those facts and considerations which might have justly had an important influence on the mind of the legislature. *Marshall C. J.* in the case of *Fletcher v. Peck* says, "The question whether a law be void for its repugnance to the constitution, is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case." The constitution of Massachusetts in the 4th article of *ch.* 1, as originally formed, authorized the legislature to establish and ordain all manner of wholesome and reasonable laws, not repugnant to such constitution, as they should judge to be for the good and welfare of the commonwealth and of the subjects of the same    And in the 10th article of

the Declaration of Rights it is stated that " whenever the public ex=
igencies require that the property of any individual should be appro-
priated to public uses, he shall receive a reasonable compensation
therefor."

Under the above mentioned limitations it is the unquestioned
province of the legislature to determine as to the wisdom and expe-
dience of a law, and how far the public interest is concerned, (if in
any degree,) and may properly be influential in the enactment of a
law directly operating on private property or private rights.   In the
case before us the legislature have made provision for compensation
to those injured by the opening the canal and the diversion of the
river into it ; and we hear no complaint from those whose lands
have been appropriated for the purposes of the canal, or those whose
lands may have been rendered less valuable, if there are any such,
by so important a change in the course of *Saco* river.   How far a
a person whose private property has not been taken from him by
means of the act of incorporation, has a right to contest the question
of constitutionality, is worthy of consideration.   On principles of
analogy it would seem he has none ; but we will not pursue this in-
quiry, or decide the point.   We apprehend that the question of con-
stitutionality does not in judicial consideration, depend on the pro-
portion which the public interest bears to private interest, in the ap-
plication of the restrictive principle on which the plaintiff's counsel
relies.   In the case of *Commonwealth v. Breed*, 4 *Pick.* 462, the
court observe, " but it is said this grant was made upon the petition
and for the sole benefit of an individual, and was not needed for the
accommodation of the public.   It is doubtless true that the leading
motive of the defendant in erecting the bridge was private profit ;
and so almost all other enterprizes, many of which have resulted
in great public improvements, have originated in private gain.   We
can see no valid objection to the constitutionality of this grant."
The grant to *Breed* was to erect a bridge from *Chelsea* to *Belle*
Island in *Boston* harbor ; and the court lay down the principle be-
fore stated in this opinion, that " in all cases the legislature has the
power to inquire when the public convenience and necessity de-
mand these partial obstructions and interruptions to navigation, and

upon what terms and conditions they may be established." The act of *March* 15, 1821, establishing the *Cumberland* and *Oxford* canal corporation, authorizes the corporation to " take and use the lands of private persons, acquiring the same title to said lands as is acquired by the public to lands appropriated for public highways, and paying a just compensation therefor." In the act establishing the *Kennebec* and *Androscoggin* canal association, passed *March* 4, 1826, there is a clause exactly in the same words. Are these acts unconstitutional in respect to the foregoing provision? In the act of *June* 22, 1793, incorporating the proprietors of the *Middlesex* canal, there is this clause :—" Whereas it may be necessary in the prosecution of the foregoing business, that the property of private persons may (as in the case of highways) be appropriated for the public use ; in order that no person may be damaged," &c. &c. The act then prescribes the mode for obtaining compensation. In the act of *March* 10, 1792, incorporating the proprietors of the *Massachusetts* canal, there is a more extensive authority given. And similar power is given in the following acts, viz. that of 10th *March*, 1797, incorporating the proprietors of *Ten Mile Falls*. So in the act as to *Saco* falls canal, of *February* 1803, and in that of *Medford* canal of *March* 1805. The act of *March* 1793, empowering *Charles Barrett* to open and make a canal in the county of *Lincoln* is more in point still. On his application he was authorized " to open and cut a navigable canal from the upper part of *Barrett's* town (now *Hope*) so called, in said county of *Lincoln*, beginning at the distance of twenty five miles above the head of the tide in *George's* river, so called, in the county aforesaid, to communicate with the sea, at the mouth of said river." The same power was given to take and appropriate private property as in the other acts before cited, making compensation for it. Here a sufficient quantity of water is to be taken for the canal ; and the preamble of the act states that the object in view in making the canal was to avoid the falls in *George's* river. Had not the legislature as much right to change the course of *Saco* river and shorten it thereby fifteen miles, as to avoid an obstruction occasioned by falls? The act incorporating the proprietors of the locks and canals on *Connect-*

*icut* river confers similar powers; and among others, *John Worth-ington,* *Caleb Strong* and *Theodore Sedgwick* appear in the act as proprietors; three of the most eminent lawyers in that section of the country. Many other acts similar in principle might be mentioned. All these canals and locks are or were to be made at private expense, and for the profit of the proprietors; yet as the legislature granting the several charters considered that a public good would result from the existence of this species of river or highway, they gave to the proprietors the same power of appropriating private property in effecting the object in view as is exercised in the location of highways. But we have never heard of any objection to these acts on the ground of unconstitutionality; and yet why are they not as liable to the objection as the act incorporating the proprietors of the *Fryeburg* canal? They were authorized merely to open the canal or new channel for *Saco* river; no time was limited within which the channel should be completed, nor does the act require it to be of any particular width or depth, or degree of excellence, convenience or safety, as it respects those who might transport through it, their boats, logs or lumber; no toll was granted to the proprietors, nor, by the act, were they bound to keep it in repair or free from obstructions after it was once opened according to the act. Whether the new channel opened by the defendants, under the authority of the corporation, is more or less safe and convenient than the river before the diversion of it, we apprehend to be no question in this cause; if properly opened, the defendants are not responsible.

The act of incorporation empowers the corporation to open a new channel for *Saco* river, between two given points; and the act of *February 23,* 1818, as before stated, bars all claims for damages " at the expiration of six years from and after the time the said *Saco* river shall have been turned and taken its course through the said new channel." The several acts must be construed as one act, being *in pari materia.* What then did the legislature mean, in the absence of all descriptive language, by the words " a new channel for *Saco* river?" The act of 1818, fixes the liability of the corporation and its members, for damages, as terminating at the time of

the turning of the river and taking its course through the new channel; and allows six years after that time to prosecute for the accrued damages. On this principle, the new channel seems to have been contemplated as opened when the river should be turned into it and take its course through it; and it is stated in the report that "since the year 1820, all the water of said river has been diverted from its ancient channel at *Russell's* creek, so called, in said town of *Fryeburg*, and flowing through *Bear* and *Bog* ponds and meeting its former channel again near the land of *John H. Frye*, and running in this new course through what is called the canal." According to this fact, it seems that such a new channel was opened, sometime in the year 1820, as the legislature intended by the act of incorporation.

The report further states that *Spring* was the owner of a large quantity of logs in *Saco* river from 1821, to the commencement of the action, and those are the logs mentioned in the writ; and this implies that he did not own them till after the canal was opened and the course of the river changed. In addition to this, it appears by the writ that that the *gravamen* alleged, which we have before copied *verbatim* from the declaration, has no connexion with or reference to any insufficiency or imperfection of the new channel; but all which the plaintiff complains of is, that the defendants, by removing the banks of the river, prevented his logs from floating down the river as they would have done, if there had been no diversion; instead of which they were carried into the new channel. All this is true; but do these facts lay a foundation on which this action can be sustained, when by an act of the legislature the proprietors had a legal authority for diverting the river from its ancient channel? In our allusion to the limitation in the act of 1818, which has been made above, our only object was to aid us in giving to the expression in the first act, "opening a new channel," our construction as to its import and meaning; and without reference to the constitutionality of it, against which the plaintiff objects. The plaintiff in his declaration does not allude to either of the acts before mentioned, much less claim any damages in virtue of any of their provisions; therefore if the facts which have been reported to us, in con-

nexion with those provisions, amount to a justification of their conduct, the action of course must fail.

Having thus considered the general ground of defence under the first head or division of the cause, we now proceed to examine the special ground, presented on the demurrer to the replication to the seventh plea. The substance of this plea has already been stated, and also of the replication. The plea states a good defence, and the question is whether the replication has avoided it. As we have before observed, the act of incorporation limits no time within which the new channel or canal should be completed ; and in such a case the general principle of the common law implies and requires that it should be done in a reasonable time. In such a case as this, the question as to reasonable time is matter of evidence, depending on facts which are not before the court. When the facts are found, it is a question of law. It is true that the length of the canal is given ; but as to the time and expense requisite for its completion the court know nothing. The replication professes to avoid the plea by saying that the corporation never opened the new channel according to the provisions of said acts ; and on the demurrer, the counsel for the defendants contend that the replication is bad, as it contains no averment of any neglect, or that a reasonable time had elapsed, before the plaintiff sustained the injury of which he complains ; it being a traversable fact, as much as an averment of special notice or of performance of a condition precedent on the part of the plaintiff is traversable. These are familiar principles. The plaintiff's counsel in reply, contends that his replication puts every thing in issue, including the question of reasonable time. The averment is that the proprietors have never opened a new channel, in the prescribed rout in manner and form as in the said acts is provided ; and yet these acts contain no provision as to time. Whether a reasonable time had elapsed or not, is not the question ; but whether on demurrer the averment that it had elapsed is not essential to the sufficiency of the replication. Upon the principles of pleading we are strongly inclined to the opinion that it is. Nothing was averred in it but a nonconformity to the provisions of the acts, in the manner of opening the new channel for *Saco* river.

Our opinion is, that the defence is sustained upon the broad, general ground on which we have examined and placed it; and it seems to be also on the demurrer to the replication to the seventh plea; and thus we close our observations on the first head or division of the cause.

The disposition which we have thus made of the cause, renders it unnecessary for us to proceed any further; but still, as to the second division of the subject, we would observe, that the ground of action assumed by the plaintiff is not covered by the specific process which the act of incorporation has prescribed. It was the usual mode of redress pointed out in acts of a similar character previously passed, having for their object the claims of those whose property might be taken or appropriated for the contemplated purposes. From the provision of a remedy for this class of persons and no others, an argument may well be drawn in favor of the defence, and of the exemption of the proprietors from liability for consequential damages like those demanded in this action; inasmuch as the act does not declare them liable for such damages, nor liable for repairs, nor grant them any toll. Towns are expressly made liable for the repair of highways, and for damages to individuals suffering from bad roads; and corporations entitled to and receiving toll are also liable on that principle. As to the questions arising on the pleadings, based on the statute of limitations, being the last division of the cause, we forbear all observations, and waive the examination of them, as wholly unnecessary.

*Plaintiff nonsuit.*