In re BANGOR HYDRO–ELECTRIC COMPANY.

In re Application for Approval of Location of Transmission Lines in the Town of Ellsworth Over Land Owned by Richard W. Whitney, Ellsworth, Maine.
Law Docket No. 735.

In the Matter of PUBLIC UTILITIES COMMISSION.

In re Application of Bangor Hydro-Electric Company for Approval of Location of Transmission Lines in the Town of Ellsworth Over Land Owned by Richard W. Whitney, Ellsworth, Maine.
Law Docket No. 735A.

Supreme Judicial Court of Maine.

Jan. 25, 1974.

Preti & Flaherty, Harold C. Pachios, Portland, for plaintiff.

Albert Chick Blanchard, Bangor, Horace S. Libby, Public Utilities Commission, Augusta, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEATHERBEE, Justice.

No. 735 is an appeal by the landowner from an order of the Public Utilities Commission approving a taking by eminent domain by the Bangor Hydro-Electric Company of an easement over land in Ellsworth upon which the Applicant company proposed to erect and maintain two transmission lines carrying 34.5 kilovolts (34,-500 volts). The appeal raises an issue of statutory interpretation of first impression.

We sustain the appeal.

The Applicant, Bangor Hydro-Electric Company, is a corporation organized under the general law of the State of Maine for the purpose of making, generating, selling, distributing and supplying electricity for lighting, heating and other public purposes. It is authorized to produce, distribute and sell electricity throughout northern and eastern Maine including the area of Ellsworth where it operates a transmission station near Route 1A in Ellsworth Falls. The Applicant had found that the large load growth in the Ellsworth area heavily taxes its existing distribution system, forcing it to its load limit. It concluded that the safety and reliability of its system, especially in view of additional anticipated growth, necessitates the addition of a new substation at a location near Route 1 in Hancock running between the transmission station and the proposed substation. After some study as to location

of the new transmission line, the Applicant decided upon a route which crosses the land of Richard E. Whitney, the Protestant. The Applicant seeks to take from him by eminent domain a strip of land 100′ wide and approximately 3,400′ long which bisects Dr. Whitney's 150 acre certified tree farm on which there is an established two-story forest of mature trees. Dr. Whitney protested the taking and the Public Utilities Commission conducted hearings on three days at which time it heard testimony from the Applicant's witnesses to the effect that construction of the new transmission line is necessary to the continuation of safe, efficient and satisfactory service to the public and that the proposed route through Dr. Whitney's tree farm is the proper route to take. Protestant did not dispute the necessity of the construction of the transmission line but presented evidence to the effect that the proposed construction would result in serious loss of timber and timber growing area and the inflicting of important aesthetic and ecological damage. He also submitted evidence which he contends demonstrates that the public needs would be at least as well satisfied if the proposed line followed one of two other alternate routes which Dr. Whitney contends the Applicant has ignored. The Applicant disputed the appropriateness of the alternate routes.

The Public Utilities Commission found that the taking of the proposed easements over the Whitney land was reasonably necessary and approved of the taking. The Protestant appealed to the Court as provided by 35 M.R.S.A. § 303.[1]

The statute authorizing the taking by eminent domain of which the Bangor Hydro-Electric Company has sought to avail itself was enacted by the Maine Legislature in 1929, P.L.1929, ch. 263, and this is the first time in which this Court has been called upon to construe the somewhat unique requirements for the exercise of the

---

[1]. He also invoked the Law Court's jurisdiction to determine the constitutionality of the Commission's order in a separate complaint brought under 35 M.R.S.A. § 305. We will not reach the issues asserted in that complaint as our determination of his appeal makes his section 305 complaint (Law Docket No. 735A) moot.

power of eminent domain. The Commission, aware that this language was yet to be interpreted by this Court, undertook to give a complete statement of its own statutory construction and of its application of the statute, as construed by the Commission, to the facts it found from the testimony.

*Analysis of law of eminent domain prior to 1929*

The statute's significance can best be appreciated if we first examine the state of our law on the subject of eminent domain as it existed at the time of the legislative action.

In 1929 it had been well settled for over a century that the state, as an attribute of sovereignty, through the legislature, may take private property for public purposes upon the legislature's determination that a necessity exists.[2] Spring v. Russell, 7 Me. 273 (1831); Cottrill v. Myrick, 12 Me. 222 (1835).

■ It was clearly established in Maine that when the legislature undertakes to take particular land for public purposes the determination of necessity is a political question for the legislature alone.[3] Spring v. Russell, supra; Kennebec Water Dist. v. City of Waterville, 96 Me. 234, 52 A. 774 (1902). It was equally clear that when the legislature has made the initial general determination that the public exigencies require that *some* property be taken for a certain defined public purpose, the administrative agency to which the legislature has delegated the authority may make the specific determination that the public exigencies require the taking of particular property. The agency's determination of exigency is also a political decision and not subject to judicial review. In re Conant,

83 Me. 42, 21 A. 172 (1890). *See also* Rubin v. W. H. Hinman, Inc., Me., 253 A.2d 708 (1969); Smith v. Speers, Me., 253 A. 2d 701 (1969); 1 Nichols on Eminent Domain § 3.21 [3] (rev. 3d ed. 1973).[4]

■ The legislature, after such an initial finding of necessity, may similarly delegate a nonreviewable determination of necessity to a quasi-municipal corporation (Kennebec Water Dist. v. City of Waterville, supra; Bowden v. York Shore Water Co., 114 Me. 150, 95 A. 779 (1915)) or even to a private corporation which is to take land for a public use. The private corporation then stands in the same position as the legislature.

"There is nothing better settled than the power of the legislature to exercise the right of eminent domain, for purposes of public utility. This may be done through the agency of private corporations, although for private profit when the public is thereby to be benefitted.

. . . The use being public, the determination of the legislature that the necessity which requires private property to be taken, exists, is conclusive." Riche v. Bar Harbor Water Co., 75 Me. 91, 96 (1883).

■ The delegation of an unrestricted agency to take by eminent domain includes the determination of the suitability of the property for the particular public use *and* the extent to which the property must be taken to satisfy the exigency. Hayford v. City of Bangor, 102 Me. 340, 66 A. 731 (1907).

"Thus, it will be seen that courts have no power to re-examine the question of necessity or exigency, or the extent to

---

2. Of course, it is axiomatic that fair compensation must be paid for the property taken for public use. Me.Const., art. I, § 21.

3. However, the legislature may, if it chooses, require the determination of necessity to be made by another agency. Roberts v. Portland Water Dist., 124 Me. 63, 126 A. 162 (1924).

4. While the determination of necessity is, in such instances a nonreviewable governmental decision, the determination whether the *purpose* is a public or private purpose is a judicial question. Brown v. Gerald, 100 Me. 351, 61 A. 785 (1905); Paine v. Savage, 126 Me. 121, 136 A. 664 (1927).

which land may be taken for a public use, unless that power *is expressly reserved to them."* (Emphasis added.) 102 Me. at 345, 66 A. at 733.

The *Hayford* Court added a generally accepted qualification of this last statement which recognizes the court's power to act if the determination of necessity is made in bad faith or through an abuse of power. *See also* Bowden v. York Shore Water Co., supra.

Only three years before the legislature passed the statute in question, the Court had said, in Smith v. Western Maine Power Co., 125 Me. 238, 239, 132 A. 740, 741 (1926):

"The Legislature has properly delegated [in 1907] to the corporation the power to determine whether 'public exigencies' require the taking of a new route for its transmission line. No abuse of power appearing, the court will not and cannot for this reason interfere."

Thus, at the time the legislature enacted the statute under consideration it was well settled that it could delegate a determination of what particular land should be taken for public purposes and that this determination was subject to judicial review only when exercised in bad faith or as an abuse of power.

■ But, as the language of *Hayford* reminds us, the legislature *may* place limits upon the discretion it gives its agencies and *may* make their determinations subject to a more extensive review.

At the time of the legislature's action, the powers to take by eminent domain which it had chosen to delegate to the various public service corporations were not identical. The charters of many private water companies (Moseley v. York Shore Water Co., 94 Me. 83, 46 A. 809 (1900)), private electric companies (Smith v. Western Maine Power Co., supra) and railroad corporations (Hall v. Pickering, 40 Me. 548, 555 (1855)) had given them the power to

take by eminent domain for public purposes, unlimited except by the common law principle that they may not act in bad faith or in an abuse of power (or by subsequent general law).

The general law had also conferred upon railroad corporations (R.S.1916, ch. 56, §§ 24, 26), street railway corporations (R.S. 1916, ch. 58, §§ 15, 17) and telephone and telegraph companies (R.S.1916, ch. 60, § 17) the power of eminent domain (some of them with limitations to be discussed later) but corporations organized under the general law for the purpose of manufacturing and selling electricity, although permitted to construct and maintain their lines along the public streets and highways, were not empowered to take by eminent domain (R. S.1916, ch. 60, §§ 10, 13).

We must remember, however, that many private electric companies had acquired their corporate existence through charters which had given them eminent domain powers.

*Interpretation of 1929 statute*

In 1929 the legislature enacted P.L.1929, ch. 263:

"Sec. 1. Right of eminent domain granted to electric power companies. Corporations organized under the provisions of section three of chapter sixty of the revised statutes and corporations chartered by special acts of the legislature for the purpose of making, generating, selling, distributing and supplying electricity for lighting, heating, or other public purposes are hereby authorized and empowered to take and hold by right of eminent domain such lands and easements as may be necessary for the proper location of their transmission lines which are designed to carry voltages of five thousand volts or more and of necessary appurtenances thereto, located within the territory in which said corporations are authorized to do a public utility business, in the same manner and under the same conditions as set forth in

chapter sixty-one, sections eleven to twenty-two, of the revised statutes and amendments thereto.

Sec. 2. Exceptions to application of rights. This right shall not apply to lands or easements located within three hundred feet of an inhabited dwelling, nor to lands and easements on or adjacent to any developed or undeveloped water power, nor to lands or easements so closely paralleling existing wire lines of other utility corporations that the proposed transmission lines would substantially interfere with service rendered over said existing lines except with the consent of the owners thereof, nor to lands and easements owned or used by railroad corporations.

Sec. 3. Location to be approved by public utilities commission. Any location to be so taken for such transmission lines shall be approved by the public utilities commission." [5]

Our problem lies in the interpretation of the language of this statute. It is obvious that it gave for the first time the authority to take by eminent domain to electric companies which had been organized under the general law and it placed new limitations on the power of such corporations which had been given this authority when chartered by special acts of the legislature. It is not contended by the Protestant that the statute gave the Commission new authority

to determine the exigency for the taking of *some* land for public use. But we are concerned with the construction of the language "necessary for the proper location" and to the extent of the responsibility of the Public Utilities Commission as to proof before it that the location is the proper location.

We are aided in our analysis of this issue by the forthright and carefully chosen language of the Commission's decision which makes it clear that it considers that the legislature granted electric companies full authority to determine public exigency (which is not disputed here) and that the Commission must also accept the utility's determination as to proper location subject only to the four specific statutory limitations as to location, in the absence of proof of bad faith, arbitrariness or abuse of power. [6]

Thus, the Commission applies to takings under this statute the same principles that are controlling in takings by the legislature itself, by authorized administrative agencies and municipal and quasi-municipal governments and to takings by private corporations where no approval by a regulatory body is required by statute. The Commission has concluded that the legislature's 1929 determination that takings by an electric power company should for the first time be subject to approval by the Public Utilities Commission as to "proper loca-

---

5. This statute is now 35 M.R.S.A. § 2306 and is substantially unchanged except that electric cooperatives now enjoy equal eminent domain rights as to transmission lines and both corporations and cooperatives are given limited eminent domain rights as to distribution lines, subject to Commission approval.

6. The Commission measured its own authority in such language as
"The Commission finds that selection of a 'proper location' imposes on the electric companies the burden of meeting the judicial standards of review of its location, that it not be the result of arbitrary or capricious actions. The Commission has no power to withhold its approval once the electric company has met this burden."

and
"35 M.R.S.A. § 2306 delegates the power of eminent domain to electric power companies subject to those limitations specifically enumerated in the statute and enforced by the Commission through its power of approval. Those limitations do not place the burden on the company to show that the location selected is the best of all hypothetical alternatives. Rather the company need show selection of a location which is not the result of arbitrary or capricious action. It is the electric power company that possesses the power of eminent domain, not the Commission, and the Commission may not substitute its judgment for that of the electric company absent a showing of arbitrary or capricious action."

tion" was not intended to give that tribunal any of the responsibility, formerly exercised exclusively by the condemnor, as to the appropriateness of the location taken.

We disagree with the Commission's interpretation of the legislature's intentions.

We must first reconsider the rules of construction which we have held applicable to examination of statutes which authorize takings by eminent domain.

■ Statutes authorizing the taking of private property against the will of the owner must be construed strictly against the donee of the right. The power so granted is not to be extended beyond the plain, unmistakable meaning of the language used. Words in the statute fairly susceptible of a meaning limiting the power are to be so construed if the facts will fairly permit. Clark v. Coburn, 108 Me. 26, 78 A. 1107 (1911); Hamor v. Bar Harbor Water Co., 78 Me. 127, 3 A. 40 (1886); Spofford v. Bucksport & Bangor R. R., 66 Me. 26 (1876).

We must bear in mind that prior to 1929 there were many small, local companies manufacturing electric power. Most of them had been created by special acts of legislatures. In some cases the charters of these corporations had granted them the power to take property by eminent domain. *E. g.*, Smith v. Western Maine Power Co., supra. In other cases the charters had not. *E. g.*, Priv. & Sp.L.1905, ch. 314. While these electric corporations had not been authorized to take by eminent domain under the general law, all electric companies *had* been empowered to erect and maintain their lines along municipal streets and public highways, subject to the approval of municipal officers and, in plantations and unorganized areas, by the County Commissioners. R.S.1916, ch. 60, § 13.

It is evident that the procedures by which electrical power reached the consumer during the first two decades of the twentieth

century became inadequate and unsatisfactory during the third decade. Demands for rural electrification had increased, the services which could be performed electrically had multiplied and technical developments had made possible the transmission of higher voltages over greater distances to meet the new demands. Large producers of power serving great areas replaced the small local companies. Increased voltage was accompanied by enhanced public danger [7] and wider right-of-way clearance for transmission lines was required for safety. Village streets were no longer adequate locations for transmission lines and efficient service required the acquisition of rights of way more direct than the courses of public highways. Landowners were not always willing to give easements across their properties for the new heavy voltage lines. Then—as now—most people demanded good electric service but wanted the transmission lines built somewhere other than on their land. It is evident from a study of legislative debate on section 2306 that the legislators were aware of the serious public annoyances and hazard which would be presented by the improper location of the new high voltage lines.[8] We consider that the legislature was unwilling to leave the choice of location to the judgment of the utilities, as it had earlier done in the charters of many local companies.

The Maine Legislature had earlier made a similar decision as to railroads. In P.L. 1836, ch. 204 the legislature had granted railroad corporations the power to take private property by eminent domain for the location, construction and operation of their railroads, not to exceed four rods in width.

By 1865 it had become apparent that the expanding railroad business required the building of depots and P.L.1865, ch. 321 extended the power of eminent domain to include land taken for this purpose. The Revised Statutes of 1871, ch. 51, § 2, fur-

---

7. Edwards v. Cumberland County Power & Light Co., 128 Me. 207, 146 A. 700 (1929).

8. Me.Leg.Rec. 523–33, 554–57 (1929).

ther extended the power so that it included land "for necessary tracks, side tracks, depots, wood sheds, repair shops, and car, engine and freight houses". In 1865 and 1871 the legislature apparently concluded that an independent agency should have the responsibility for determining the necessity and extent as to this newly authorized taking. In 1871 it was provided that as to the taking for side tracks and buildings, the *Railroad Commissioners* shall determine "how much, if any, of such real estate is necessary for the reasonable accommodation of the traffic and appropriate business of the corporation". R.S.1871, ch. 51, § 3.

In construing that statute in Spofford v. Bucksport & Bangor R. R., supra, 66 Me. at 40–41, this Court said:

"But the legislature was not willing to grant to railroad corporations this great right of eminent domain to be exercised at their discretion, but carefully guarded it by providing in section three, that, 'if the parties do not agree as to the necessity and extent of the real estate to be taken for said side tracks and buildings, the corporation may make written application to the railroad commissioners . . . [who] shall then view the premises, hear the parties, and determine how much, if any, of such real estate is necessary for the reasonable accommodation of the traffic and appropriate business of the corporation.'"

Substantially the same language controlled the taking of such additional land in 1929 (R.S.1916, ch. 56, § 26, P.L.1925, ch. 154) except that the Public Utilities Commission had supplanted the Railroad Commissioners as the approving administrative body and the standard of approval of the taking had become the Commissioner's finding that the land is "reasonably required in the safe, economical and efficient operation of the railroad and in rendering of adequate common carrier service to the public". Similar language continues today in 35 M.R.S.A. § 652.

As this Court pointed out in *Roberts*, supra note 3, the legislature can delegate to the donee of the power the full determination as to the necessity of the taking (subject to judicial scrutiny for bad faith and arbitrariness) or the legislature may see fit to empower an administrative tribunal or a court to make that determination.

Our examination of these statutes demonstrates that other Maine legislatures have considered it inadvisable to give complete discretion as to exigency to various other corporate utilities and, in varying language, have delegated specific responsibility to the Public Utilities Commission.

■ Undoubtedly the accepted rule is that a large discretion is necessarily vested in the donee of the power of eminent domain and will not be interfered with unless the donee is guilty of bad faith or arbitrary or capricious action. 26 Am.Jur.2d Eminent Domain § 114 (1966).

■ The same rule is apparently applied, in the absence of statutory limitations, to the selection of the location of the land and the amount of it needed. 29A C.J.S. Eminent Domain § 9 (1965).

However, the language of the statute now under consideration appears to be unique and we find little precedential value in the decisions of other states which have statutes requiring that corporate takings be approved by an administrative tribunal. Several of these have been called to our attention by the parties' briefs.

The Pennsylvania statute under consideration in the latest Pennsylvania Supreme Court's study of the issue which has come to our attention (Stellwagon v. Pyle, 390 Pa. 17, 133 A.2d 819 (1957)) permitted a taking by an electric company for location of its facilities, including transmission lines, but required that the Public Utility Commission

"shall have found and determined, after public hearing, that the service to be furnished by said company through the

exercise of said power is necessary or proper for the service, accommodation, convenience, or safety of the public. . . ." 15 P.S. § 1182 (now 15 P.S. § 3272).

The Court adopted the language of Byers v. Pennsylvania Public Utility Comm'n, 176 Pa.Super. 620, 626, 109 A.2d 232, 234 (1954) and ruled:

> " 'The selection of a route for transmission lines is a matter for the public utility in the first instance and unless it is shown that it proposes to exercise the powers conferred upon it wantonly or capriciously the law does not intend that the Commission should withhold its approval merely because another route might have been adopted, which would damage the owners less or lessen the inconvenience to them in the operation of their farm.' " 390 Pa. at 23, 133 A.2d at 822.

It seems to us that the Pennsylvania statute is significantly lacking in language such as is found in our own specifically requiring the Commission's approval as to the *proper location* which involves factors not necessarily contained in a determination of whether the Pennsylvania "service to be furnished [through the taking] . . . is necessary or proper for the service, accommodation, convenience or safety of the public." [9]

The Louisiana courts have repeatedly held that

> "the courts will not disturb or interfere with the exercise [of eminent domain in taking rights of way] . . . in the absence of fraud, bad faith or conduct

or practices amounting to an abuse of the privilege." United Gas Pipe Line Co. v. New Orleans Terminal Co., 156 So.2d *297*, 302 (La.Ct.App.1963), cert. denied, 245 La. 567, 159 So.2d 284 (1964), quoting from Central Louisiana Electric Co. v. Covington & St. Tammany Land & Improvement Co., 131 So.2d 369, 375 (La.Ct.App.1961).

However, the statute which controlled the Louisiana taking required only that the facilities

> "shall be so located, constructed, operated, and maintained as not to be dangerous to persons or property nor interfere with the use of the wires of other wire-using companies or, more than is necessary, with the convenience of the landowner." Central Louisiana Electric Co. v. Covington & St. Tammany Land & Improvement Co., supra, at 374.

In California a general statute has required that a taking by eminent domain be located in a manner *most compatible with the greatest public good and the least private injury.* We find that a District Court of Appeal in San Diego Gas & Electric Co. v. Lux Land Co., 194 Cal.App.2d 472, 476, 14 Cal.Rptr. 899, 902 (1961) applied the principle announced by the Supreme Court in City of Pasadena v. Stimson, 91 Cal. 238, 255, 27 P. 604, 608 (1891):

> " 'The selection of a particular route is committed in the first instance to the person in charge of the use, and unless there is something to show an abuse of the discretion, the propriety of his selection ought not to be questioned, for certainly it must be presumed that the state

---

**9.** We should also note here that we are fully in agreement with the Pennsylvania Court that approval should not be withheld *merely* because another route might have been adopted which would be less damaging to the owner of the property. Certainly, *all* relevant factors should be considered by the Commission, as we will discuss later.

We notice that a Pennsylvania Superior Court case, West Penn Power Co. v. Pennsylvania Public Utility Comm'n, 199 Pa.Super.

25, 30, 184 A.2d 143, 145 (1962) has upheld a determination by the Commission that the "selection of the route, as proposed herein by applicant, constitutes an unreasonable disregard of the property owners' rights under the law." In at least another case, Laird v. Pennyslvania Public Utility Comm'n, 183 Pa. Super. 457, 133 A.2d 579 (1957), the Superior Court considered the question to be a viable issue.

or its agent has made the best choice for the public; and if this occasions peculiar and unnecessary damage to the owners of the property affected the proof of such damage should come from them.' "

We note, however, that in 1959 the California legislature saw fit to amend an earlier statute concerning taking land for *public parks* which had made conclusive the agency determination of necessity and location, and chose instead to make *this* particular determination only prima facie evidence—somewhat as our own legislatures have decided that certain proposed takings should be examined on a different basis from others. The District Court of Appeal said:

"After 12 years of experience, the Legislature apparently decided that it would be better to allow the courts the right to judicially review the proposed taking where it was for the purpose of a public park . . . ." People ex rel. Department of Natural Resources v. O'Connell Bros., 204 Cal.App.2d 34, 41, 21 Cal. Rptr. 890, 894 (1962).

The guide to statutory construction written by Justice, later Chief Justice, Dunn in Roberts v. Portland Water District, supra, warrants repeating. He said:

"In interpreting and construing a statute one must, so to speak, walk round the legislation, view it from every side and in every light, and read its letter and deduce its spirit conformably to well-established rules, till from it he has unfolded the single controlling thought around which everything in the whole enactment shall center, and to which in the final determination all shall at last return." 124 Me. at 65, 126 A. at 163.

We have made such a study of our own statute, and we believe that the 1929 Legislature accepted the electric companies' need to exercise eminent domain but concluded that the great public interest in the location of the transmission lines—sometimes in conflict with the engineering advantages of the company's choice—necessitated giving an independent tribunal the determination of where the lines should properly be located. The legislature left the determination of the necessity for *a* taking to the electric company and then (after excluding certain areas as inappropriate for any takings) gave the Public Utilities Commission this new responsibility, somewhat as it had done for railroads, street railways and water districts.

■ The Public Utilities Commission's responsibility, then, under the 1929 statute is not simply to examine the company's choice for bad faith, arbitrariness or capriciousness but, rather, to make the determination as to whether the proposed location is the proper location in terms of the public interest.

As we believe the Commission has misconceived the extent of its authority, we must remand this matter for further examination by the Commission in the light of our interpretation of the statute.

*Is it intended that the Public Utilities Commission shall give weight to the environmental effects of a proposed transmission line and, if so, to what extent?*

This question cannot be answered without first examining the significance, if any, of a statute enacted by the 105th Legislature.

The Bangor Hydro-Electric Company filed its petition April 12, 1971. Hearings were had on May 3, July 16 and July 22, 1971, and the order of the Commission was filed August 10, 1972. However, on September 23, 1971—*after* the hearings had been completed but *before* the Commission's order—there became effective an act passed by the 105th Legislature, the effect of which upon the Commission's duties in this case must be considered.

The act to which we refer was introduced in the House of Representatives and became L.D. 1264, entitled "An Act Relating

to Public Utility Transmission Lines", and was reported out of the Committee on Public Utilities favorably but on a divided report. As originally written it would have amended 35 M.R.S.A. § 2306, the statute we have been considering, by repealing the last paragraph and by substituting a provision that *all* acquisition of rights in lands, whether by purchase or by eminent domain, for such electrical transmission lines, must have the approval of the Public Utilities Commission, after notice and hearing. It added:

"[A] corporation proposing acquisition of land for such transmission line shall have the burden of showing that the public exigencies require its installation and that there is no alternative to the proposed location and character of such transmission line which will lessen its impact on the environment without unreasonably increasing its cost.

The commission may approve or disapprove all or portions of such proposed transmission line, and shall make such orders regarding its location, character, size, width installation, maintenance and appearance as will lessen its impact on the environment, having regard for any increased costs thereby caused."

The majority ought-to-pass report was accepted in the House of Representatives,[10] while the Senate accepted the minority ought-not-to-pass report.[11] The two bodies joined in a Committee of Conference and then each enacted L.D. 1264 with a Committee of Conference amendment. After enactment it became P.L.1971, ch. 476, having undergone a significant metamorphosis.

The new law left section 2306 intact and, instead, amended Title 35 by adding a new section, section 13–A. It reads:

"§ 13–A. Construction of transmission lines and generating facilities prohibited without prior order of the commission

When any electrical company or companies propose to erect within this State a permanently installed power generating facility of more than 1,000 kilowatts, or transmission lines carrying 125 kilovolts or more, said company or companies shall file a petition with the commission on a form or forms to be prepared by the commission which shall contain such facts and details as the commission shall reasonably require. The petition shall be set down for public hearing.

In its order the commission shall make specific findings with regard to the need for such facilities and if the commission finds that a need exists, it shall issue a certificate of public convenience and necessity for the facilities proposed. If the commission orders or allows the erection of such facilities, such order shall be subject to all other provisions of law and the right of any other agency to approve said facilities.

At any public hearing held by the commission as to the erection and construction of a transmission line, the electric

10. Reports of these actions are found in Me. Leg.Rec. 2862–2866, 2999, 3289, 4102, 4295 (1971).

11. During Senate debate on this measure, it was explained that this bill was in fact a site location and not a public utility issue and should be handled by the Environmental Improvement Commission. The members were assured that another bill then pending before the Committee on Natural Rsources could better accomplish the purpose of L.D. 1264. Me.Leg.Rec. 2862–2866 (1971). The Senate then voted to accept the minority ought-not-to-pass report.

The bill which had been recommended to the the Senate as more appropriate to serve the desired purpose was L.D. 989, the Uniform Utility Environmental Protection Act, which would have imposed exceptionally extensive and detailed requirements upon public utilities in areas of environmental concern. This bill later died quietly when the Committee's ought-not-to-pass report was accepted by both houses without debate and the bill was placed in the files without further action as provided by Rule 17–A. Me.Leg.Rec. 2855, 2875 (1971).

company shall submit a map to the commission at least 14 days prior to such public hearing. Said map shall be available to the public at the offices of the commission and shall indicate the proposed location and route of such transmission line and a description of any planned equipment and facilities to be' placed thereon. The commission may approve or disapprove all or portions of such proposed transmission line, and shall make such orders regarding its location, character, size, width installation, maintenance and appearance."

Chapter 476 also amended 38 M.R.S.A. § 484, the Site Location Law, by adding a new paragraph:

"In case of a permanently installed power generating facility of more than 1,000 kilowatts or a transmission line carrying 125 kilovolts or more proposed to be erected within this State by an electrical company or companies, the proposed development, in addition to meeting the requirements of subsections 1 to 4, shall also have been approved by the Public Utilities Commission under Title 35, section 13–A."

It also excluded such transmission lines from developments which had been excepted from the operation of the Site Location Law by 38 M.R.S.A. § 488 because they were existing, authorized or under construction on January 1, 1970.

When we analyze the language and history of chapter 476 there is apparent a legislative intention that the impact upon the environment of a proposed construction of a transmission line carrying 125 kilovolts or more and the acceptability of that impact should be determined by the Board of Environmental Protection according to the provisions of the Site Location Law, 38 M.R.S.A. §§ 481–488, as amended. Whether the legislature intended the Board's authority in the area of environmental effect to be

exclusive is not before us, as the present proposal is to construct lines to carry a voltage of only 34.5 kilovolts.

Thus, we now have in effect a statute (the 1929 law) giving the Public Utilities Commission certain authority over the location of transmission lines designed to carry voltages of 5000 volts (5 kilovolts) or more and another (the 1971 act) which requires approval by the Board of Environmental Control of location of lines carrying 125 kilovolts or more.

We cannot say from the language and history of chapter 476 that the 105th Legislature's decision to give the Board of Environmental Protection authority over construction of transmission lines carrying 125 kilovolts or more indicates an intention that the Public Utilities Commission should *not* consider environmental factors when determining the proper location of lines with *smaller* capacities. We do not find chapter 476 helpful in deciding our present question.

■ Of course, the right of eminent domain was given to private utilities only in order to further the public interest [12] and the 1929 Legislature certainly required the Commission's approval here for the purpose of protecting all aspects of that interest. The only lands the taking of which the Commission may approve are those which would provide the proper location. We note that the legislature insisted that the land chosen must be more than *a* proper location. It must be *the* proper location.

■ We believe the use of the words "the proper" in this context was intended by the legislature to demand more than that the land be appropriate for the utility's purpose: it must be the location which best serves the *public interest.*

It seems to us that the 1929 Legislature intended the Commission to take into consideration all factors bearing on the public

---

12. We should point out here that the taking must be for a public *use* and the fact that a great *benefit* to the public would result from

the taking is not sufficient to justify the use of eminent domain. Haley v. Davenport, 132 Me. 148, 168 A. 102 (1933).

interest in making its decision, including environmental factors. The relative importance of these factors may fluctuate with changing conditions of human existence. Some environmental effects from a taking which would have been considered inconsequential in 1929 may carry important weight today. The Commission is correct in its assumption that ecological and aesthetic factors must be given reasonable weight by the Commission—but, as is demonstrated by our previous interpretation of the statute, the Commission is in error in holding that to be effective these factors must so preponderate as to render the utility's proposal arbitrary or capricious.

*Availability of alternate routes*

 Another element of this case which has been strongly contested is the manner in which the Commission should weigh the existence of alternate routes. Again, the Commission correctly recognized that the availability of alternate routes is a factor which it must consider, but the Commission considered itself without power to deny approval of the utility's proposed location unless another route is so preponderately more appropriate to the public interest as to render the utility's proposal arbitrary or capricious. We say, instead, that if the evidence shows the existence of appropriate alternate routes, the relative appropriateness of these routes is a factor which the Commission must consider, along with the other factors, in determining whether the Applicant has satisfied the Commission by a fair preponderance of the evidence that the proposed location is *the proper* location—that is, one more in the public interest than any others proposed. While the fact that there is an acceptable alternate route would not in itself justify the Commission's denying an application, the totality of all the evidence presented as to all the factors bearing on the public interest might leave the Commission convinced that the alternate route is the proper location. Of course, one of the factors

bearing on the public interest is the comparative costs, because increased costs of acquisition and construction may be borne, in part, at least, by the rate-payers and could, of course, make the expense of a project prohibitive, depriving the public of needed services. We hardly need to mention that also among the factors bearing on the appropriateness of the choice are safety and the quality of the service expected to result. The comparative appropriateness of alternate routes which other courts have found relevant in determining "reasonable necessity" under *their* statutes is at least equally important in the determination of the "proper location" under our own. *See* State Highway Bd. v. Loomis, 122 Vt. 125, 165 A.2d 572 (1960); Moore Mill & Lumber Co. v. Foster, 216 Or. 204, 336 P.2d 39 (1959).

 The presentation of credible evidence by a protestant suggesting the availability of an acceptable alternate route (or the Commission's own doubts concerning the effect of the proposed location upon the public interest) should entitle the utility to opportunity for further study and presentation as to the alternate route in support of its position. The Commission, in such a case, should require sufficient evidence to satisfy it, in its discretion, that the proposed location is the proper location before it grants its approval.

We are mindful that, especially in residential areas, the utility's opportunities to take by eminent domain are severely restricted by the very statute we are interpreting and that a residential property owner's unwillingness to give the utility rights of way may prove to make an otherwise appropriate alternate location unreasonably expensive or even impossible to obtain. We are aware, too, that property owners on the suggested alternate route may be similarly distressed if the route of the transmission line is shifted to cross their land. The decision as to whose property rights must yield to the public interest depends upon the Commission's deter-

mination of which location is the proper location, viewed from the standpoint of the overall public interest.

This is not to suggest any absence of authority in the Commission to inquire, *sua sponte*, into the question of proper location, in the public interest, in the absence of objection from landowners.

The entry will be:

Appeal sustained. No. 735 remanded to the Public Utilities Commission for further action consistent with this opinion.

No. 735A dismissed without prejudice as moot.

DELAHANTY, J., did not sit.

All Justices concurring.