2002 ME 96

**Nancy BLANCHARD et al.**

**v.**

**DEPARTMENT OF TRANSPORTATION et al.**

Supreme Judicial Court of Maine.

Argued: Oct. 9, 2001.
Decided: June 20, 2002.

Patrick Sharkey, (orally), Boston, MA, David A. Lourie, Cape Elizabeth, for plaintiff.

Rebecca H. Farnum, (orally), Deborah M. Mann, (orally), Portland, for defendants.

Panel: SAUFLEY, C.J., CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Nancy Blanchard[1] appeals from a partial summary judgment entered in the Superior Court (Cumberland County, *Warren, J.*) in favor of the Department of Transportation on the issue of the authority of the Department to take land owned by Blanchard. Blanchard also appeals

---

1. There are three named plaintiffs in this case: Nancy Blanchard, the Estate of Winifred Blanchard, and the Nancy Blanchard Cousins Island Charitable Remainder Unitrust. Because Nancy Blanchard is the personal representative of the estate and the sole trustee of the unitrust, she is referred to as if she were the sole plaintiff.

from a judgment of the court entered following a three-day nonjury trial, in which the court concluded that the public use clause of Article I, § 21, of the Constitution of Maine had been satisfied in the taking. Blanchard contends that the Department exceeded its legislative authority, and that the taking was for a private use in violation of Article I, § 21. We are unpersuaded by Blanchard's contentions and affirm the judgments of the Superior Court.

[¶ 2] Chebeague Island is a small island community in Casco Bay with approximately 350 year-round residents and about 2000 additional summer residents. The island is part of the Town of Cumberland and is not connected to the mainland by a bridge. Cousins Island, which is connected to the mainland by a bridge, is the most convenient mainland terminal for the ferry service to Chebeague Island. The ferry service is provided by the Chebeague Transportation Company (Ferry).[2] The ferry link to Cousins Island is essential to maintaining Chebeague Island as a year-round residential community.

[¶ 3] In October of 1999, the Department acquired from Blanchard, by eminent domain, 1.4 acres of land for continued use as a parking lot for ferry users traveling to and from Chebeague Island. At the time of the taking, the transportation system used by commuters consisted of the ferry service between Chebeague Island and Cousins Island operated by the Ferry, the Cousins Island wharf, a satellite parking lot located in the Town about ten miles away from the Cousins Island Wharf, serviced by a shuttle bus, and the parking lot owned by Blanchard, which is a short walk up Wharf Road from the Cousins Island wharf.

[¶ 4] Prior to the taking, Blanchard had leased the lot to the Ferry, who used it as a parking lot in conjunction with the ferry service to Chebeague Island for over thirty years. The Ferry does not transport cars, and the lot allows commuting island residents to have close access to their vehicles. The lot lease was set to terminate on January 1, 2000.

[¶ 5] After conducting extensive studies, the Department concluded that the existing facility on Cousins Island was the only feasible location for the ferry landing and that the availability of parking on Cousins Island adjacent to the wharf was essential for the operation of a ferry transportation system connecting Chebeague Island residents with their jobs, schools, hospitals, health care providers, food stores, and other essential mainland services. In order to ensure that the Blanchard lot would continue to be available for parking once the lease expired, the Department acquired the lot by eminent domain.

[¶ 6] Following the taking, the Department leased the land to the Town for its continued operation as a parking lot. The Town then subleased the parking lot to the Ferry, incorporating the same lease terms as the Department's lease. Both the Town and the Department have retained the ability to reassert control over the lot if they are dissatisfied with the Ferry's performance.

[¶ 7] The Department's lease with the Town gives the Department the right to terminate if the Town, or its assignee or

---

**2.** The Ferry is a for-profit public corporation that was created by Chebeague Island residents as a community enterprise. Ferry shares may be purchased by any member of the public. The Ferry has never paid dividends to its shareholders. The board of directors serve on a volunteer basis. The Ferry has paid federal income taxes in only three years, the last being in 1979. All revenues earned by the Ferry have either been invested in the transportation system or set aside to purchase or replace equipment.

sublessee, fail, in the sole determination of the Department, "to provide safe and accessible parking services for persons using the Transportation System." "Transportation System" is defined to include the ferry service operating between Chebeague and Cousins Islands, the wharf at Cousins Island, the Wharf Road linking the wharf with the Blanchard lot, the satellite parking lot, and the shuttle-bus service to and from the satellite lot. The Town is also obliged to "maintain the Premises in good operating condition year-round so that the Premises are accessible and safe for public use."

[¶ 8] The sublease between the Town and the Ferry gives the Town similar rights to the Department. The Ferry is also obligated to "maintain the Premises in good operating condition year-round so that the Premises are accessible and safe for public use." Both the lease and the sublease mandate that revenues generated by the lot "shall be used to support the transportation system."

[¶ 9] The lease and sublease limit parking at the lot to 165 cars, with fifteen spaces being reserved for residents of the Town of Yarmouth, and, except for ongoing barge operations, the leases prohibit all commercial activities. The Ferry allocates the 150 unreserved spaces at the lot by awarding overnight-parking permits to members of the public based on need, with first priority to members of the public who are year-round residents of Chebeague Island, who commute to and from the mainland for work on a daily basis; second priority going to other year-round residents, and third priority being any other persons who can demonstrate a specific and unusual need. Except in rare cases, each household receives only one overnight-parking permit. There are other priority-parking categories, but these generally do not need overnight permits. People who are unable to demonstrate a priority need for an overnight parking permit may park at, and obtain overnight permits for, the satellite lot. In combination, the satellite lot and the Blanchard lot are more than adequate to satisfy the demand for overnight parking.

[¶ 10] Daytime parking at the Blanchard lot is often available without a permit. During the month of August of 2000, the year after the taking, an average of seventeen vehicles per day used the Blanchard lot in this manner during the weekdays, three per day on the weekends. In addition, the Blanchard lot is the mainland terminus for the barging operation conducted by the Ferry to transport other items, such as vehicles, or freight that cannot be carried on the passenger ferry. This service is available equally to all members of the public.

[¶ 11] Blanchard initially brought this action to enjoin the Department from taking the property. After an ex parte temporary restraining order was denied (Cumberland County, *Crowley, J.*), the Department filed a notice of condemnation and tendered compensation to Blanchard. Blanchard amended her complaint, seeking to have the taking set aside. The Department answered and filed a conditional counterclaim for return of the compensation paid in the event that Blanchard prevailed. Blanchard filed a second amended complaint requesting damages based on the temporary taking of the property should the taking be determined to be unlawful.

[¶ 12] The trial court granted a partial summary judgment in favor of the Department and against Blanchard on the issues of the Department's authority to take the lot and the sufficiency of the public exigency to justify the taking. After a three day nonjury trial, the court found that

the transportation system of which the Blanchard lot is an integral part is accessible to all members of the public and the Blanchard lot is available for use by all members of the public . . ., [but] the Blanchard lot is not accessible to all members of the public on equal terms.

The evidence at trial demonstrated . . . that the limited parking space at the Blanchard lot is appropriately allocated on the basis of need.

[¶ 13] Based on these findings the court concluded that the taking was for a public use, and entered a judgment in favor of the Department. This appeal followed.

## I. PARTIAL SUMMARY JUDGMENT

[¶ 14] The Legislature has granted a general power of eminent domain to the Department pursuant to 23 M.R.S.A. § 153–B(1) (Supp.2001), which provides, in pertinent part:

> The Department of Transportation, on behalf of the State may take over and hold for the State such property as it determines necessary to:
>
> . . . .
>
> G. Construct, improve and maintain transportation projects as directed by law and provide mitigation for existing or potential environmental effects of transportation projects.

[¶ 15] The Superior Court concluded that section 153–B(1)(G) gave the Department the authority to take Blanchard's lot.

[¶ 16] We review a trial court's construction of a statute de novo. *Great Northern Paper, Inc. v. Penobscot Nation*, 2001 ME 68, ¶ 14, 770 A.2d 574, 580. Our main objective in statutory interpretation is to give effect to the Legislature's intent. *Id.* ¶ 15. "[W]e look first to the statute's plain meaning and, if there is ambiguity, we look beyond that language to the legis-

lative history to determine [that] intent." *Id.*

[¶ 17] When the Legislature delegates the power of eminent domain, the parameters of that power are strictly construed. *In re Bangor Hydro–Electric Co.*, 314 A.2d 800, 806 (Me.1974). "Strict construction, however, cannot be used to defeat the clear intent of the statute nor to construe the statute in an unreasonable manner." *Town of Union v. Strong*, 681 A.2d 14, 18 (Me.1996).

[¶ 18] Relying on the canon of strict construction, Blanchard argues that the phrase "as directed by law," in section 153–B(1)(G), limits the Department's delegated power to instances where there is a legislative directive to carry out a particular transportation project. Under this interpretation, because the Legislature did not specifically authorize either the taking of the lot or the ferry-passenger service, the Department would have exceeded its authority in taking the lot. We disagree.

[¶ 19] If the words "as directed by law" require specific statutory authorization for a taking or a project necessitating a taking, then section 153–B(1)(G) would have little meaning because the Legislature would have to enact a specific statutory authorization every time the Department wanted to take property. Section 153–B(1)(G) would serve little purpose because the specific legislation that Blanchard contends is required would serve as the authority.

[¶ 20] The more reasonable construction of section 153–B(1)(G) adopted by the Superior Court is that it is a general authorization, delegated from the Legislature to the Department, to take the property that is necessary to achieve the state's transportation policies. Accordingly, the words "as directed by law" limit the grant only by directing the Department to proceed in

a manner consistent with the general statutory guidelines governing its activities.

[¶ 21] This construction of the statute is consistent with the overall statutory scheme. *See Finks v. Maine State Highway Comm'n,* 328 A.2d 791, 798 (Me.1974) (terms of a statute will be given a meaning consistent with the overall statutory context and construed in light of the subject matter, the occasion and necessity for the law, and consequences of a particular interpretation). The Legislature has given the Department broad powers to plan and implement various transportation projects, regardless of the mode of transportation. *See* 23 M.R.S.A. § 4203(3) (1992) (transportation means "any form of transportation for people or goods within, to or from the State, whether by highway, air, water or rail"). The Legislature does not specifically allocate money for, nor does it separately approve, particular transportation projects undertaken by the Department. The Legislature generally directs the Department in terms of overall responsibility, duties, and obligations to the State and its citizens. The Legislature's declaration of the State's overall transportation policy and the Department's role is that

> adequate, safe and efficient transportation facilities and services are essential to the economic growth of the State and the well-being of its people and that the planning and development of such facilities and services shall be coordinated by a state department of transportation with overall responsibility for balanced transportation policy and planning.

*Id.* § 4204.

[¶ 22] When properly construed, section 153–B(1)(G) is a necessary grant of eminent domain power to the Department to allow the Department to effectuate the transportation policies of Maine.

■ [¶ 23] Moreover, "[t]he whole body of previous and contemporaneous legislation upon a particular topic should be considered in interpreting any statute." *Finks,* 328 A.2d at 797. Prior to 1987, the scope of the Department's delegated authority was limited to highway projects. *See* 23 M.R.S.A. § 153 (1992) (sections one through six pertained only to roadside development, automobile graveyards, and state and state aid highways). The authority to take property as necessary to "[c]onstruct, improve and maintain transportation projects as directed by law" was originally enacted in 1987 as section 153(7) of Title 23. P.L.1987, c. 267; *see* 23 M.R.S.A. § 153 (1992). In 1993, section 153 was repealed and section 153(7) was recodified as section 153–B(1)(G). P.L. 1993, c. 536, § 1. This amendment expanded the authority of the Department to exercise eminent domain power for non-highway, as well as highway projects.

[¶ 24] The Statement of Fact attached to the legislative document that was enacted as section 153–B(1)(G) also demonstrates that the "as directed by law" language refers to those types of transportation projects that the Legislature has charged the Department to plan and implement and is not a more specific limitation on when the power of eminent domain can be exercised. *See* L.D. 1410, Statement of Fact (113th Legis.1987).

[¶ 25] The legislative history reinforces this conclusion. The Department's testimony concerning L.D. 1410 included the following:

> Since 1972, the Department of Transportation has been involved with transportation projects other than just highways. We are involved with Ports and Marine Facilities including cargo terminals and fish piers. We manage an airport, and oversee other public transportation facilities. Many of those other modes of transportation require, from

time to time, that the [Department] make surveys and take property for transportation purposes. L.D. 1410 makes clear that this would be within the [Department's] authority.

In summary, L.D. 1410 clarifies the authority of the [Department] to do preliminary engineering and take property for all types of transportation projects. Transportation Committee, An Act to Clarify the Taking of Property by the Department of Transportation 1 (May 15, 1987) (statement of Jane L. Lincoln). In enacting section 153–B(1)(G) the legislature intended to allow the use of eminent domain in accordance with other statutorily authorized "purposes," and not to require specific legislative enactments for non-highway projects on a case-by-case basis.

## II. JUDGMENT AFTER TRIAL

[¶ 26] Blanchard also contends that the taking of her lot by the Department fails to satisfy Maine's constitutional requirement that any taking of private property be for a public use. Whether the use for which a taking is authorized is a public or private use is a question of law. *Brown v. Warchalowski*, 471 A.2d 1026, 1033 (Me.1984). Findings of fact by the trial court that are essential to answering this question of law will be set aside on appeal only if clearly erroneous. *Sturtevant v. Town of Winthrop*, 1999 ME 84, ¶ 9, 732 A.2d 264, 267.

[¶ 27] Article I, § 21, of Maine's Constitution provides:

Private property shall not be taken for public uses without just compensation; nor unless the public exigencies require it.

ME. CONST. art. I, § 21. The exercise of the State's power of eminent domain "must be for a public use and upon a public exigency" to meet this State's constitutional requirements. *Finks*, 328 A.2d at 794.

[¶ 28] Private property can be taken without the owner's consent only for public uses, *Warchalowski*, 471 A.2d at 1033, and can be taken through government action for private use, with or without compensation, only with the owner's consent. *Paine v. Savage*, 126 Me. 121, 123, 136 A. 664, 665 (1927).

[¶ 29] The distinction between a public and a private use to a large extent depends on the facts of each case. *Oxford County Agric. Soc'y v. School Admin. Dist. No. 17*, 161 Me. 334, 336, 211 A.2d 893, 894 (1965). As a general rule, property is devoted to a public use only when the general public, or some portion of it (as opposed to particular individuals), in its organized capacity and upon occasion to do so, has a right to demand and share in the use. *Brown v. Gerald*, 100 Me. 351, 372, 61 A. 785, 794 (1905). The public has to be able to be served by the use as a matter of right, not as a matter of grace of any private party. *Id.* The use must also be public at the time of the taking, "not only in a theoretical aspect, but rather in actuality, practicality and effectiveness, under circumstances required by public exigency." *Warchalowski*, 471 A.2d at 1029–30.

[¶ 30] Providing for public parking facilities on publicly owned land may constitute a public use:

[M]unicipal "parking facilities" [open to everyone] in effect constitute a "public use" by any definition. The public will have full access to the facilities and the right to use the same. A direct benefit will lie in the increased safety of members of the public and their property.

*Opinion of the Justices*, 231 A.2d 431, 434 (Me.1967).

[¶ 31] The fact that a government agency and municipality lease lands owned by the public to a private corporation for the operation of a public-parking lot does not make the use private. *Camden Plaza Parking, Inc. v. City of Camden*, 16 N.J. 150, 107 A.2d 1, 3 (1954) ("And the land and facility do not cease to be used for a public purpose when leased to private operators for operation as a public parking facility."); *Court Street Parking Co. v. City of Boston*, 336 Mass. 224, 143 N.E.2d 683, 687 (1957) ("the fact that private operators may be expected to profit from the operation of [public parking facilities] does not ... mean that the statutory plan is not for a public purpose").

[¶ 32] The Department undoubtedly could take the property and create a public parking facility open to every member of the public. *Opinion of the Justices*, 231 A.2d at 434. The Department could also contract with a private company for the maintenance and operation of such a parking facility. *Camden Plaza Parking*, 107 A.2d at 3. The issue in this case is whether prioritizing access to the publicly owned parking lot on the basis of need and giving priority to the year-round residents of Chebeague Island means that the parking facility is being put to private use.

[¶ 33] We conclude that giving priority parking to year-round residents of Chebeague Island does not render the use private. The "public use" clause does not preclude the allocation of a scarce resource on the basis of need.[3] Even a narrow definition of "public use" does not require equal use by all members of the public at all times on equal terms. *Poole v. City of Kankakee*, 406 Ill. 521, 94 N.E.2d 416, 419–20 (1950).

[¶ 34] The trial court found that the lot was available for use by all members of the public. The only limitation on that right is that of space availability. The court further found that the limited number of parking spaces were allocated on the basis of need. The allocation of priority permits to those with the greatest need does not transform the character of the use from public parking to private parking.

[¶ 35] Moreover, a use may be public even if the use is limited to the inhabitants of a restricted locality. *Poole*, 94 N.E.2d at 419–20. The Supreme Court of Illinois has concluded that pursuant to the "public use" clause of Illinois's Constitution a use may be limited to inhabitants of a community and remain public:

> It is not essential that the entire community or people of the state, or any political subdivision thereof, should be benefited or share in the use or enjoyment thereof. The use may be local or limited. It may be confined to a particular district, and still be public.... If local or limited, the use must be directly beneficial to a considerable number of the inhabitants of a section of the state, and the property to be taken must be controlled by law, for the advantage of that particular portion of the community to be benefitted.

*Id. See also* 2A JULIUS L. SACKMAN & RUSSELL D. VAN BRUNT, NICHOLS ON EMINENT DOMAIN § 7.02[2], at 7–27 (3rd. ed.2000) (even a strict interpreta-

---

3. Challenges to the method of allocation based on equal protection or due process have not been advanced here. *See, e.g., Lai v. New York City Government*, 163 F.3d 729, 730 (2d Cir.1998) (equal protection challenge to city's allocation of parking spaces to handicap persons); *People v. Gilbert*, 137 N.Y.S.2d 389, 392 (N.Y.Co.Ct.1954) (equal protection challenge to village ordinance providing for establishment of off street parking area for exclusive use of village residents); *State v. Whisman*, 24 Ohio Misc. 59, 263 N.E.2d 411, 415 (1970) (equal protection challenge to parking permit preferences).

tion of "public use" allows the use to be limited to inhabitants of a small or restricted locality).

[¶ 36] So long as the use concerns a community as opposed to a particular number of individuals, the use is public. The residents of Chebeague Island constitute a community. They are not a particular, identifiable group of individuals distinct from the public. Granting the year-round residents priority in the use of the small parking lot that serves Chebeague Island does not make the use private.

[¶ 37] Finally, the lot was taken to support a transportation system that is open to all members of the public. The trial court found that the transportation system is accessible by the general public on equal terms. The lot is one component of a transportation system devoted to transporting all members of the public. Parking within this system includes both the Blanchard lot and the satellite lot. Within the system, sufficient parking is available to all members of the public at those lots. Because the Blanchard lot, limited in size, cannot accommodate all of the demand for parking, spaces within the lot are allocated on the basis of need. This allocation manages a public resource to best address the transportation needs of all the people using the transportation system.

[¶ 38] Blanchard contends that the fact that the lot is being leased to and managed by the Ferry, a privately owned company, means that the use is private because the public does not have access to the lot as a matter of right because the Ferry could limit access to certain individuals. This contention is not supported by the facts in this case.

[¶ 39] The Department has taken the property for parking purposes, and in exercising the eminent domain power has implicitly guaranteed that the lot will be put to a public use. *Ulmer v. Lime Rock R.R. Co.*, 98 Me. 579, 593, 57 A. 1001, 1006 (1904). The lease between the Town and the Department retains with the Department the power to reassert control over the lot if, within the Department's sole discretion, the lot is not used for parking by persons using the ferry. The Town has promised to make the lot accessible and safe for use by the public. The Town has retained this same level of control in its lease with the Ferry and, the Ferry has covenanted to make the lot accessible to the public. Upon termination of the lease, through lapse of time or breach, possession returns to the Department. The control retained through the lease ensures that the use will remain public and makes the Department the sole arbiter of whether the Town or its assignee is providing safe and affordable public parking.

The entry is:

Judgments affirmed.

SAUFLEY, C.J., with whom ALEXANDER, J., joins, dissenting.

[¶ 40] It is the responsibility of the courts to assure that government does not abuse its extraordinary power to take the private property of its citizens against their wishes. Because the taking in this case is for the benefit of identifiable private individuals, the taking does not satisfy the public use requirement of the Maine Constitution. Therefore, I must respectfully dissent.

[¶ 41] It is well established that, without the consent of the property owner, the government may only exercise its power of eminent domain when the property is to be put to a public use and when a public exigency requires it.[4] ME. CONST. art.

4. The public exigency requirement exists only under Maine's Constitution. *Compare* ME.

I, § 21; *Ace Ambulance Serv., Inc. v. City of Augusta*, 337 A.2d 661, 663 (Me.1975); *Finks v. Me. State Highway Comm'n*, 328 A.2d 791, 794 (Me.1974).

[¶ 42] As a preliminary matter, whether any public exigency existed in this case is seriously in question. The Department initiated eminent domain proceedings despite the fact that the Blanchards were still negotiating a potential lease with the Chebeague Island Transportation Company. It is not clear from the record that the parties would not have entered into a renewed contract. Moreover, this is not a case where no spaces would be available to residents of Chebeague Island if the property was not taken.

[¶ 43] Our review of public exigency findings, however, is limited to determining whether there is any rational basis to support a finding of public exigency. *Ace Ambulance Serv., Inc.*, 337 A.2d at 663 ("[T]he question of determining *exigency* has long been considered to be a political decision for the Legislature to make, free from judicial review (unless it can be said there is no rational basis upon which exigency could be found).").[5] The asserted basis for the taking, to resolve uncertainties about the future availability of the lot, the terms of a new agreement, and the cost to patrons, could rationally be said to satisfy this highly deferential standard.

[¶ 44] In contrast to the deferential standard applied to the question of public exigency, however, a determination as to whether a use is public or private is a question of law subject to our de novo review. *Brown v. Warchalowski*, 471 A.2d 1026, 1033 (Me.1984); *Crommett v. City of Portland*, 150 Me. 217, 231, 107 A.2d 841, 849 (1954). Courts across the country are increasingly scrutinizing the use of eminent domain to ensure that property is not taken for private purposes. Engaging in this scrutiny, the Illinois Supreme Court recently reminded the parties that "[t]he power of eminent domain is to be exercised with restraint, not abandon." *Southwestern Ill. Dev. Auth. v. Nat'l City Envtl., L.L.C.*, 199 Ill.2d 225, 263 Ill. Dec. 241, 251, 768 N.E.2d 1, 11 (2002) (holding that property could not be taken for use as a private parking lot, thereby enabling a private business to avoid the open real estate market); *see also 99 Cents Only Stores v. Lancaster Redev. Agency*, No. CV 00–07572 SVW, 2001 WL 811056, at *6 (C.D.Cal.2001) (finding a taking unconstitutional where property was taken to enable a private company to expand); *Henn v. City of Highland Heights*, 69 F.Supp.2d 908, 913 (E.D.Ky.1999) ("Naked and unconditional governmental power to compel a citizen to surrender his productive and attractive property to another citizen ... [to use] predominantly for his own private use just because such an alternative private profit is thought ... preferable in the subjective notion of governmental authorities is repugnant to our constitutional protections ...."), *vacated on other grounds by* 3 Fed. Appx. 487 (6th Cir.2001); *Condemnation of 110 Wash. St.*, 767 A.2d 1154, 1160 (Pa.Commw.Ct.2001) (holding that a private party may not direct condemnation of property), *appeal denied by* 567 Pa. 748, 788 A.2d 379 (2001).

[¶ 45] A public use is " 'one in which all the public has a right to demand and share ....' " *In re Opinions of the Justices*, 118 Me. 503, 515, 106 A. 865, 872 (1919) (quoting *Brown v. Gerald*, 100 Me. 351, 372, 61 A. 785, 794 (1905)). Property cannot be

CONST. art. I, § 21 *with* U.S. CONST. amend. V.

5. The same standard of review applies when an administrative agency makes the determination of public exigency. *In re Bangor Hydro Elec. Co.*, 314 A.2d 800, 805–06 (1974).

taken from one private individual solely for the benefit of another private individual. *See Haw. Hous. Auth. v. Midkiff,* 467 U.S. 229, 245, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984).

[¶ 46] Although the mere fact that the government's use of a piece of property will benefit private parties does not render a taking unconstitutional, a public use must be the dominant purpose of the taking. *Crommett,* 150 Me. at 236, 107 A.2d at 852 (holding that the dominant purpose of the taking was a public purpose); *In re Opinions of the Justices,* 118 Me. at 516, 106 A. at 872 (finding the public benefit to be only incidental). As one court framed the issue: " '[T]he tail cannot wag the dog' and allow the *public* purpose to be only incidental to a predominantly private one ....". *Baycol, Inc. v. Downtown Dev. Auth. of Fort Lauderdale,* 315 So.2d 451, 456 (Fla.1975). The use "must be more than a mere theoretical right to use. It must be an actual, effectual right to use." *Brown v. Gerald,* 100 Me. at 373, 61 A. at 794.

[¶ 47] A use that benefits a particular class of identifiable individuals, rather than the community at large, is a private use. *See Haw. Hous. Auth.,* 467 U.S. at 245, 104 S.Ct. 2321. In addition, a use is public only if the right to use the property is " 'independent of the will of the person or corporation taking title under condemnation, and [ ] such use by the public is protected by law.' " *Oxford County Agric. Soc'y v. Sch. Admin. Dist. No. 17,* 161 Me. 334, 337, 211 A.2d 893, 895 (1965) (quoting *Tuomey Hosp. v. City of Sumter,* 243 S.C. 544, 134 S.E.2d 744, 747 (1964)). In *Brown v. Gerald,* the illustrations used demonstrate this notion:

If it be a railroad company, the public have a right to be transported, and to have their goods carried from place to place, upon payment of reasonable tolls. The company must accommodate them, whether it will or no. If it be a canal or turnpike or bridge, all may travel thereon. If it be a boom company, all who have logs in the river are entitled of right to have the booms used for them. If it be a telephone or telegraph company, its privileges are open to, and compellable by all. If it be a water company, the entire public has, and must have, a right to the use of the water.

100 Me. at 372, 61 A. at 794.

[¶ 48] Here, prior to the taking, the Blanchard property had been used as a private parking lot, with spaces allocated on a priority basis. After the taking, the same use was made of the property. The only difference was that the Chebeague Island Transportation Company was charged a lower fee for leasing the property.[6] The ancillary private benefit to the company would not prove fatal to the taking if the post-taking use of the parking lot was in fact a public use. The dominant beneficiaries of the parking lot, however, are a select group of individuals living on Chebeague Island rather than the Chebeague Island community at large. The spaces in the lot are not available to the general public, but rather are allotted to private individuals. Only households with a member who lives on the island year-round and who works on the mainland get top priority for a space, and only one space is available per household. This is a particular, identifiable group of individuals. They have a private need for the spaces, which was being met by a private parking lot. Moreover, the priority system results

---

6. The Superior Court indicated that the company's savings at the Blanchard lot were more than offset by increases at a satellite lot, for which the company was not charged prior to the taking. Nonetheless, the cost of using the Blanchard lot was reduced substantially.

in public access at the will of the company, thus preventing any member of the Chebeague Island community from demanding a right to use the lot.

[¶ 49] Because the State has exercised its extraordinary powers to take private property by eminent domain in circumstances that benefit a private individual or industry, that is, the individuals allotted spaces and the company, there is insufficient public use of the property that has been taken, and therefore the taking does not satisfy the requirements of the Maine and United States constitutions.

[¶ 50] I would vacate the judgment of the Superior Court.